In re WONDER CORPORATION OF AMERICA, Debtor.

Bankruptcy No. 5–86–00436.

United States Bankruptcy Court, D. Connecticut.

April 28, 1987.

See also 70 B.R. 1018.

Douglas A. Strauss, David A. Greenberg, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for debtor.

Richard D. Zeisler, Craig I. Lifland, Zeisler & Zeisler, P.C., Bridgeport, Conn., former attorneys for debtor.

Christopher Belmonte, Kevin Preston, Lane & Mittendorf, New York City, for Waldco, Inc.

Richard Belford, New Haven, Conn., Former Chapter 7 Trustee.

Robert S. Evans, Byron P. Yost, Evans & Baldwin, P.C., Bridgeport, Conn., for former Chapter 7 Trustee.

Martin W. Hoffman, Hartford, Conn., for Unsecured Creditors' Committees.

Donald Lee Rome, Stephen E. Goldman, Susan Roman, Caren A. Senter, Robinson & Cole, Hartford, Conn., for Chase Manhattan Bank, N.A.

Thomas A. Gugliotti, Walter E. Paulekas, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for Old Stone Bank.

Michael A. Zizka, Murtha, Cullina, Richter & Pinney, Hartford, Conn., Ethan D. Fogel, Neal Colton, Dechert, Price & Rhoads, Philadelphia, Pa., for Societe Generale.

## MEMORANDUM AND DECISION ON ALLOWANCE OF ADMINISTRATIVE EXPENSES UNDER CODE § 503(b)(1)(A) AND DETERMINATION OF REASONABLE FEES AND EXPENSES UNDER CODE § 506(b)

ALAN H.W. SHIFF, Bankruptcy Judge.

On June 23, 1986, Wonder Corporation of America ("Wonder") filed a petition under Chapter 7 of the Bankruptcy Code. The case was converted to Chapter 11 on September 18, 1986. On March 4, 1987, an *ex parte* scheduling order entered fixing March 20, 1987 as the last date for filing all applications for administrative expenses under Code § 503 and for professional fees and costs under Code § 506(b).[1] The order further stated that "in the event that the applications are not so filed with this Court by that date, such claimants are forever barred from seeking reimbursement or compensation on account of such claims". April 3, 1987 was set as the date for a hearing to determine all such claims. On April 7, 1987, an order entered confirming an amended plan[2] filed jointly by Wonder and Waldco, Inc. (the "Proponents"). The plan calls for the payment of administrative expenses and § 506(b) fees and related costs as allowed by the court. This decision provides the amount of certain administrative expenses and all of the § 506(b)

---

1. On March 11, 1987, a Notice of Appeal was filed by Chase Manhattan Bank, N.A., Old Stone Bank and Societe Generale.

2. On April 20, 1987, Notices of Appeal were filed by Chase Manhattan Bank, N.A. and Old Stone Bank.

fees and costs and the findings upon which those determinations are made.

## I

### ADMINISTRATIVE EXPENSES

Administrative claims trace their origin under the Code to § 503, which provides in pertinent part:

(b) After notice and a hearing, there shall be allowed administrative expenses, ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate ...

Code § 327(a) authorizes a trustee, with court approval, to employ attorneys, accountants, appraisers, and auctioneers. Similarly, § 1103(a) authorizes a creditors' committee, appointed under § 1102, to employ attorneys and other professionals. On July 11, 1986, Richard Belford, Esq. was appointed Chapter 7 trustee, having served as interim trustee since the commencement of the case. Trustee Belford thereupon applied for and obtained court approval for the employment of, *inter alia*, Paul Bruggeman, consultant; Phillip Sweedler & Son, auctioneer; Leonard Plotnick, appraiser; Evans & Baldwin, P.C., attorneys; and Laventhol & Horwath, certified public accountants.

On August 26, 1986, Martin W. Hoffman, Esq. was appointed attorney for the Chapter 7 committee of creditors holding unsecured claims,[3] and on November 14, 1986 he was appointed attorney for the Chapter 11 creditors' committee.

There has been no objection to the administrative expense classification of the trustee's fees and costs, the fees and costs of those he employed, or the fees and costs claimed by Attorney Hoffman. I agree with those classifications and accordingly turn to a consideration of their allowable amount.

Code § 330(a) provides in pertinent part that after notice and a hearing, the court may award to a trustee and a professional person appointed pursuant to §§ 327(a) and 1103(a),

(1) reasonable compensation for actual, necessary services rendered by such trustee ... professional person, or attorney ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

Section 328(a) limits compensation under § 330(a) as follows:

Notwithstanding such terms and conditions [of employment], the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in the light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

In construing § 330(a), courts generally consider the factors initially articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), which concerned the reasonableness of attorneys' fees awarded in class action employment litigation under title VII of the Civil Rights Act of 1964. Those guidelines were subsequently extended to the determination of attorneys' fees in bankruptcy cases in *In re First Colonial Corp. of America*, 544 F.2d 1291, 1298–99 (5th Cir.) *cert. denied* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *see also In re Yermakov*, 718 F.2d 1465 (9th Cir.1983), and are also useful in assessing the services of other professionals. The factors identified by the *Johnson* court are as follows: (1) time and labor required; (2) novelty and difficulty of the questions; (3) skill requisite to perform the legal service properly; (4) preclusion of other employment; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time pressures; (8) amount involved and

---

**3.** Although the Code does not specifically provide for the employment of counsel by a creditors' committee elected pursuant to Code § 705(a), on August 26, 1986, upon the application of the creditors' committee, this court authorized such employment in this case in accordance with Code § 105(a).

results obtained; (9) experience, reputation and ability of the attorneys; (10) "undesirability" of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases.

With those factors and the purposes and policies of the Bankruptcy Code in mind, and having reviewed the applications, and considered the arguments of the parties in interest as well as the relevant portions of the file in this case, I conclude that administrative expenses should be allowed and paid in the following amounts for the reasons corresponding thereto.

### 1. CHAPTER 7 TRUSTEE

#### Richard Belford, Esq.

▇ Attorney Belford, an experienced and highly competent trustee, seeks payment of $13,025.00 [4] for his services as Chapter 7 trustee. He rendered valuable services both in arranging for the protection and preservation of estate property and in negotiating for its sale. His efforts to arrange for a public sale for an amount in excess of the secured debt were vigorously resisted by Chase Manhattan Bank, N.A. ("Chase"), Old Stone Bank ("Old Stone"), and Societe Generale ("Societe") (the "Banks" or "Bank"). That opposition is reflected in the hours claimed by the trustee and all attorneys in this case.

The amount requested by the trustee is fully documented by the time sheets he submitted. His application was not opposed by the debtor, the creditors' committee, or any other party in interest; it was supported by George A. Vannah, Esq., the Estate Administrator; and it is accordingly allowed as follows:

| | |
|---|---|
| Allowed fee— | $13,025.00 |
| Allowed costs— | 55.00 |
| Total allowed administrative expense— | $13,080.00 |

**4.** For purposes of this decision, all numbers have been rounded to the nearest dollar.

**5.** The relevant portion of Rule 20, Local Rules of Bankruptcy Procedure provides that:

(e) In all applications for reimbursement of expenses an itemization as to purpose, amount and date of incurral, accompanied by

### 2. ATTORNEYS FOR CHAPTER 7 TRUSTEE

#### Evans & Baldwin, P.C.

▇ Attorney Byron Paul Yost, on behalf of the Evans & Baldwin firm, filed an application as counsel for the Chapter 7 trustee which itemized 363 hours and requested a fee allowance of $49,002.00. A review of the time sheets discloses that Attorney Yost's employment commenced on August 12, 1986. That employment terminated on September 18, 1986, when the case was converted. During that short period, Attorney Yost's efforts were essentially directed at negotiating a sale of estate assets by public auction with a minimum guaranteed bid in an amount in excess of the secured lenders' claims so that there would be a dividend for unsecured creditors.

Selling estate assets is a Chapter 7 trustee's primary function, and it is difficult for the court to find that so much attorney time was necessary in this case. The trustee, however, supports his attorney's application on the basis that the resistance mounted by the secured creditors necessitated Attorney Yost's assistance.

In addition, it must be observed that the application reveals excessive duplication. While it is clear that Attorney Yost was the principal representative of the firm, all too often and for no justifiable reason, not only Attorney Yost, but his senior partner, Robert S. Evans, Esq. appeared at conferences and hearings. Furthermore, an inappropriate number of hours has been claimed for intra-office conferences and meetings with other parties.

Attorney Yost's application also includes a request for reimbursement of $1,213.00. Although this request was not accompanied by an affidavit, as required by Local Rule 20,[5] sufficient information was submitted

the submittal of an invoice, receipt or other documentation for each item for which reimbursement is sought. The general costs of doing business such as regular postage, ordinary telephone expenses and travel to and from court will not be allowed.

to support a finding that those expenses were actually incurred and are reasonable.

Taking the trustee's argument into account but reducing the fees in recognition of the fact that more attorney time was charged than is reasonably necessary, I conclude that 200 hours at $135.00 per hour is reasonable, and that amount and costs are allowed as an administrative expense as follows:

| | |
|---|---|
| Allowed fee— | $27,000.00 |
| Allowed costs— | 1,213.00 |
| Total allowed administrative expense— | $28,213.00 |

## 3. OTHER PROFESSIONALS EMPLOYED BY TRUSTEE

The trustee appointed, with court approval, the following professionals, each of whom performed necessary services. Their applications were not opposed by any party in interest and are allowed as follows:

(a) Paul Bruggeman—Consultant

| | |
|---|---|
| Allowed fee | $275.00 |

(b) Phillip Sweedler & Son—Auctioneer

| | |
|---|---|
| Allowed fee | $2,586.00 |

(c) Leonard Plotnick—Appraiser

| | |
|---|---|
| Allowed fee | $500.00 |

(d) Laventhol & Horwath—Certified Public Accountants

| | |
|---|---|
| Allowed fee | $1,250.00 |
| Allowed costs | 44.00 |
| Total allowed administrative expense | $1,294.00 |

## 4. ATTORNEYS FOR THE DEBTOR IN POSSESSION

Zeisler & Zeisler, P.C.

Pullman, Comley, Bradley & Reeves

■ (a) Zeisler & Zeisler ("Z & Z"), Wonder's initial attorneys, rendered services from June 1, 1986 to February 28, 1987. This firm is highly experienced in the area of Chapter 11 reorganization, and its time sheets indicate the performance of actual, necessary and valuable professional services. It is noteworthy that while Z & Z frequently furnished more than one member of the firm at court hearings and con-ferences, fees for no more than one attorney are sought.

Z & Z has requested $105,420.00 for 692 hours of service and $1,564.00 for out-of-pocket expenses which are appropriately itemized and supported by documentation pursuant to Local Rule 20(e). They voluntarily reduced their claim to $103,984.00 (including expenses and a retainer). Their adjusted application received a favorable recommendation from the Estate Administrator and was not opposed by any party. Z & Z is accordingly allowed an administrative expense of $103,984.00 as follows:

| | |
|---|---|
| Allowed fee (including $10,000.00 retainer) | $102,420.00 |
| Allowed costs | 1,564.00 |
| Total allowed administrative expense | $103,984.00 |

■ (b) Pullman, Comley, Bradley & Reeves ("PCB & R"), successor counsel to Wonder, requests $57,277.00 for 453 hours commencing January 27, 1987 plus expenses of $2,871.00 which were itemized and supported by affidavit, but were subsequently reduced at the hearing by $286.00. PCB & R undertook valuable services for Wonder at a critical time with minimal duplication of appearances by two attorneys at court hearings. This firm expeditiously assumed responsibility for this vigorously contested case and was able to propose a joint plan within one week of its employment. While it is clear that prior counsel performed much of the complex preparation for the drafting and submission of the initial disclosure statement and plan, it is significant that PCB & R familiarized itself quickly thereby permitting Wonder to avoid costly overlapping services. The transition between it and prior counsel was smooth and well-coordinated, and both firms are to be given credit for this lack of interruption in the reorganization process. No party in interest has objected to the fees requested by this firm.

PCB & R is accordingly allowed an administrative expense as follows:

| | |
|---|---|
| Allowed fee | $57,277.00 |
| Allowed costs | 2,585.00 |

| | |
|---|---|
| Total allowed administrative expense | $59,862.00 |

## 5. ATTORNEY FOR COMMITTEES OF UNSECURED CREDITORS

### Martin W. Hoffman, Esq.

■ Martin W. Hoffman, Esq. has filed applications in the amount of $7,395.00, representing 49 hours, plus expenses of $5.00 for services as counsel to the Chapter 7 creditors' committee, and $54,678.50, representing 372 hours, plus expenses of $639.00 incurred as counsel to the Chapter 11 creditors' committee. Attorney Hoffman represented the committees skillfully, drawing upon a considerable depth of experience in bankruptcy matters, his efforts succeeded in achieving a 70% dividend to unsecured creditors, and a review of his time sheets indicates a reasonable use of time performing actual, necessary services. Accordingly, $62,717.00 is allowed as an administrative expense as follows:

### (a) Chapter 7

| | |
|---|---|
| Allowed fee | $7,395.00 |
| Allowed costs | 5.00 |
| Total allowed administrative expense | $7,400.00 |

### (b) Chapter 11

| | |
|---|---|
| Allowed fee | $54,678.00 |
| Allowed costs | 639.00 |
| Total allowed administrative expense | $55,317.00 |

## II

## FEES AND COSTS UNDER § 506(b)

Loan agreements typically contain clauses which provide that if the loan is not repaid in accordance with its terms, the borrower agrees to pay reasonable attorney's fees and costs of collection. Oversecured creditors may seek to have the bankruptcy estate pay such fees and costs pursuant to Code § 506(b) which provides in relevant part:

To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim; interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The prepetition agreements between Wonder and Chase contained the following clause:

The undersigned [Wonder] will pay to the Bank all expenses (including expense for legal services of every kind) of, or incidental to, the enforcement of any of the provisions hereof or of any of the Liabilities, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement of any of the Security or receipt of the proceeds thereof, and for the care of the Security and defending or asserting the rights and claims of the Bank in respect thereof, by litigation or otherwise, including expense of insurance; and all such expenses shall be indebtedness within the terms of this note.[6]

The Reimbursement Agreement entered into by Wonder and Societe on December 18, 1980, provides that the debtor will be responsible for the "reasonable fees and out-of-pocket expenses, if any, in connection with the enforcement of this Agreement...."[7] Similarly, the loan agreements between Wonder and Old Stone required Wonder to reimburse the Bank for the "reasonable costs, fees and expenses" incurred in protecting its interests.[8]

In accordance with those agreements and pursuant to the March 20, 1987 scheduling order, the Banks filed applications and appeared at the April 3, 1987 hearing in support of their claims under § 506(b).

The Banks contend that claims under § 506(b) must be interpreted under state

---

**6.** This provision appears in the nine Collateral Promissory Notes, the Security Agreement, and the Amended and Restated Security Agreement upon which Chase bases its claim. (Chase Exhibit 2).

It should be noted that under the terms of these clauses, Chase is not limited to *"reasonable"* costs of collection.

**7.** Societe Exhibit 2, Section 16.

**8.** Open-End Mortgage Securing a Commercial Revolving Loan and Security Agreement and Letter Securing a Confirmed Line of Credit, October 18, 1985, ¶ 16.

not federal law. The Proponents agree that the claimed fees and costs should be assessed under § 506(b), but vigorously argue that the Banks' fees and costs are excessive. The issues presented here are (1) by what standard is the reasonableness of fees and costs determined under § 506(b) and (2) applying that standard, to what extent are the fees and costs claimed by the Banks reasonable?

Parenthetically, it must be observed that fees under § 506(b) are the proper subject of judicial scrutiny, particularly where, as here, they are in dispute. *See Matter of Salisbury,* 58 B.R. 635, 640 (Bankr.D.Conn. 1985); *In re Lagasse,* 71 B.R. 551 (Bankr. D.Conn. 1987); *In re LeMarquis Associates,* 65 B.R. 719, 721 (Bankr.E.D.Cal.1986) (district court remanded to bankruptcy court "to reconsider [attorney's fees]" in light of section 506(b)).

(1)

Counsel for the Banks contend that a determination of the reasonableness of § 506(b) fees is confined to an analysis of the services performed under the loan agreement construed under state law.[9] To buttress that position, Old Stone relies upon and quotes from *Matter of Salisbury, supra,* 58 B.R. at 640.

It appears in this circuit, however, that the factors involved in a § 330 determination need not be the identical factors used by a court in deciding reasonable fees under § 506(b). As emphasized by the *United Merchants* court, "claims for collection costs are based in contract and are independent of statutory compensable administrative expenses for services rendered to the estate.... Collection costs claims ... are not subject to the statutory limitations on reimbursement for expenses of administering the estate." 674 F.2d [134] at 138–139 [2d Cir.1982]. Furthermore, the court indicated in such cases state law will apply to determine reasonable fees. 674 F.2d at 139. *Accord Vogel v. Triangle Equipment Co., Inc. (In re Triangle Equipment Co., Inc.),* 26 B.R. 175, 177,

(W.D.Va.1982) ("The award of attorney's fees in a bankruptcy proceeding under a private agreement is a question of 'the extent and nature of property rights' which is to be determined in accordance with state rather than federal common law.")

Old Stone, however, neglected to include the next sentence from *Salisbury* which recalled that the court of appeals in *United Merchants*

went on to repeat a warning first made in *In re Continental Vending Machine Corp.* [543 F.2d 986 (2d Cir.1976)]. In permitting recovery of expenses covered by contract, "a rule of reason must be observed in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors, who, knowing that the estate must foot the bills, fail to exercise restraint in enforcement expenses," 674 F.2d at 139. The *United Merchants* court concluded: "The controlling inquiry is whether, considering all relevant factors including duplication, the creditor reasonably believed that the services employed were necessary to protect his interest in the debtor's property." 674 F.2d at 140.

*Id.*

Notwithstanding that admonition, counsel for the Banks persist in the assertion that bankruptcy is not a *"relevant factor"* and that the reasonableness of their fees is to be determined from the client/creditor's perspective without reference to what is permissible and appropriate after bankruptcy. In that context, Old Stone contends that "[t]o the extent that this analysis [the perception of the secured creditor of what services fall within the agreement] is subjective, it is necessary for the Court to place itself in the shoes of the secured creditor to determine *what was commercially reasonable* for such a lending institution under the context of the litigation." [10] (emphasis added).

The Banks' logic is conceptually flawed. Neither *Continental Vending, United*

---

**9.** *See* Old Stone Bank Memorandum of Law, March 31, 1987, at 4, 5.

**10.** Old Stone Bank Memorandum of Law, March 31, 1987 at 8.

*Merchants, Salisbury* nor its progeny, *Lagasse*, stands for the proposition that what is reasonable must be tested without reference to post-petition considerations. There is a significant difference between what an attorney may do for a creditor/client before and after bankruptcy. Before bankruptcy, legal services are only confined by the scope of activity permitted by the loan agreement in the context of nonbankruptcy law. After bankruptcy, a whole new set of restrictions and considerations are added. As was stated in *Matter of Nicfur-Cruz Realty Corp.*, 50 B.R. 162 (Bankr.S.D.N.Y. 1985):

> The requirement of Code § 506(b) that fees be "reasonable" imposes a limitation on the amount of contractually agreed upon attorneys' fees which may properly be awarded by the bankruptcy court in addition to any limitation or consideration that would be placed under state law. This reasonableness requirement mandates that the bankruptcy court consider, among other things, both the policies, purposes and provisions of the Bankruptcy Code. (footnote omitted).

*Id.* at 167. The *Nicfur-Cruz* court concluded that "[i]t is inherently unreasonable to ask a debtor to reimburse attorneys' fees incurred by a creditor that are not cost-justified either by the economics of the situation or necessary to preservation of the creditor's interest in light of the legal issues involved." *Id.* at 169.

While it is clear that courts must look to the underlying contract as the initial focal point, it is equally clear that after bankruptcy, it is § 506(b), not state law, through which that look is focused, and that examination must view not only the contours of § 506(b) but also the broader penumbra of bankruptcy law. *See In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051 (5th Cir.1986) (bankruptcy law determines the proper amount of attorney's fees under § 506(b)); *Matter of 268 Ltd.*, 789 F.2d 674 (9th Cir.1986) (bankruptcy court properly conducts an independent inquiry into the reasonableness of attorney's fees under § 506(b) which preempts state law governing the availability of such fees as part of a secured claim). *Cf. In re K.H. Stephenson*

*Supply Co.*, 768 F.2d 580 (4th Cir.1985), (Congress intended that attorney fee provisions may be awarded under § 506(b) notwithstanding contrary state law).

■ Contracts do not exist in a vacuum. Their life and meaning depend upon the legal environment in which their enforcement is sought, and it is a fact of life that after bankruptcy a creditor's rights are more restricted because of the codified public policy of giving a debtor an opportunity to attempt to reorganize. Thus, a prepetition contract may not authorize or justify legal services that are incompatible with existing bankruptcy law and policy, and rights and remedies which were appropriate under a loan agreement construed under state law before bankruptcy, such as the right to foreclose, may be limited or prohibited thereafter. *See* § 362(a). *See also In re LeMarquis Associates, supra*, 65 B.R. at 724. To hold otherwise would permit a creditor to pressure the proponent of a plan into accepting unwanted provisions and conditions, or suffer not only the consequences of obstruction, but also the cost of the legal fees generated to exert that pressure and the fees necessary to defend against it. Moreover, since it is common for reorganization to depend upon outside investment, such financing might be chilled if oversecured creditors were permitted to increase and pass along fees and costs without the restraint of bankruptcy considerations. Congress, which has provided proponents of plans with the means of compelling acceptance, *see* §§ 1124 and 1126(f), or cramming down dissenters, *see* § 1129(b), could not have intended to give creditors such an economic weapon.

■ I accordingly conclude that in determining what legal fees are reasonable under § 506(b), the following overlapping factors should be considered:

1. The legal services must be authorized by the loan agreement;

2. They must be necessary to promote the client's interest;

3. They must be permitted under applicable law, including the Bankruptcy Code;

4. They must be compatible with bankruptcy policy as derived from relevant provisions of the Bankruptcy Code and the judicial decisions which construe it;

5. The time spent must be appropriate to the complexity of the task;

6. The hourly rate must be appropriate under applicable bankruptcy standards;

7. The task must be assigned to the fewest and least senior attorneys able to render the service in a competent and efficient manner;

8. The fee should be adjusted to reflect duplicative services rendered by attorneys representing other parties with a common interest in the case; and

9. The fee should be adjusted to reflect the court's observation of the nature of the case and the manner of its administration.

(2)

The Banks assert, and it is conceded by all parties, that each is oversecured. It is necessary, however, to consider the extent of their equity cushion, as that element is an underlying factor in the determination of the extent to which their legal services and costs are reasonable under § 506(b).

On July 9, 1986, approximately two weeks after the commencement of the case, Wonder filed Schedule A-2 listing the Banks' secured claims in the total amount of $4,904,449.00. According to that Schedule, Societe had a claim of $1,625,000.00, Chase had a claim of $1,700,000.00 and Old Stone's claim was $1,579,449.00. It has been disclosed in Wonder's papers and elsewhere that Societe had a first lien on Wonder's real estate and that the other Banks shared a second lien on that property and a first lien on virtually all of the remaining property, including machinery and equipment, raw materials, finished goods, accounts receivable, cash, and fixtures.

On October 22, 1986, Old Stone filed its proof of claim and on January 30, 1987, Chase and Societe filed their proofs of claim. On March 7, 1987, Societe filed a supplemental proof of claim which listed a debt that has been subsumed by Chase's claim and is therefore excluded from this analysis. The proofs of claim state the following:

Old Stone—$1,622,949.00 and interest of $9,127.00 plus "contingent and accrued interest, costs and expenses of $38,125.00";

Chase—$1,526,399.00 plus undisclosed "accrued and accruing" interest, fees and other charges;

Societe—$1,662,455.00 plus undisclosed interest fees and other charges.

Wonder's schedules also disclosed that its real estate had a value of $4,500,00.00 [11] and its other assets had an aggregate value of $3,595,141.00.[12]

On August 19, 1986, the trustee filed an appraisal by Leonard Plotnick, dated August 8, 1986, which valued Wonder's property as follows:

| | |
|---|---|
| Real estate | $4,700,000.00 |
| Machines and equipment | 325,000.00 |
| Vehicles | 15,000.00 |
| Finished work and work in progress | 800,000.00 |
| Office furnishings | 25,000.00 |
| Total | $5,865,000.00 |

Chase's application includes statements rendered by two appraisal firms. A statement from Gordon W. Jones and Associates is dated May 28, 1986 and statements from Daley-Hodkin Appraisal Corporation are dated August 18, 1986 and February 10, 1987. Although Chase did not submit the results of those three appraisals, the last of which was done on February 2, 1987, its attorney, Donald Lee Rome, conceded on cross-examination during the April 3, 1987 hearing that a pre-petition appraisal obtained by Wonder which valued Wonder's real estate at $5,500,000.00 was, as early as October, 1986, considered credible. That amount exceeded the combined debt owed to the Banks. Attorney Rome conceded,

---

11. Schedule B-1.

12. Among the assets listed by the debtor in its Summary of Debts and Property filed with the Bankruptcy Court were the following: inventory—$2,900,913.00; contingent and unliquidated claims—$300,000.00; machinery, equipment and supplies—$146,150.00; deposits—$73,707.00; and office equipment and supplies—$56,520.00.

moreover, that Chase held liens on Wonder's other assets.

As noted, each Bank has asserted throughout this case that it is oversecured. Indeed, it is only because each is oversecured that it may claim fees and costs under § 506(b). Furthermore, at least as early as February 3, 1987, when the Proponents filed their original disclosure statement and plan, the Banks knew that they were to be paid in cash on the effective date of the plan under § 1124(3).

Although there may be some question as to the total amount of each Bank's secured claim compared to the total value of the collateral securing it at any given time, the above numbers leave no question but that there was a substantial equity cushion when this case was commenced and an appraisal that did not encompass all of Wonder's assets, done soon thereafter, demonstrated that equity cushion to be just under one million dollars. Accordingly, there was never an appreciable risk at any time that any Bank would not be paid in full in accordance with applicable bankruptcy law. In fact, Societe's attorney, Michael A. Zizka, argued at the April 3, 1987 hearing that the value of estate assets was even sufficient to fully satisfy the claims of the unsecured creditors. Despite that secured position, counsel for the Banks claim, and want the estate to pay for, more than 2,600 hours of legal services.

## A

■ Chase's application failed to provide a breakdown of fees and disbursements. While it is not this court's obligation to produce coherent data to support fee applications, and Chase submits a deficient application at its peril, the exigencies of Wonder's attempt to reorganize requires an expedited decision which necessitated that the court extrapolate information from sometimes illegible and confusing raw data rather than demand that Chase resubmit its application.

In a summary, Chase claims fees and disbursements totaling $188,240.00, of which $180,315.00 appears to be allocable to fees. Chase's summary, however, does not show hours spent, and it has been necessary to extract hours claimed from the flawed computer printouts, a line by line analysis of which indicates that Chase was probably billed $176,881.00, representing 1,290 hours. These figures are adopted by this court as constituting Chase's claim as of the March 20, 1987 bar date. In addition, Chase seeks a disbursement allowance of $11,123.00. Of that sum, $1,925.00 constitutes out-of-pocket expenses of Chase's attorneys; $7,698.00 represents appraisals by Daley Hodkin Appraisal Corporation and $1,500.00 is for the appraisal by Gordon W. Jones and Associates.

■ Chase's application failed to observe strictly the requirements of Local Bankruptcy Rule 20 which requires that expense requests be supported by invoices, receipts, or other documentation. However, since Chase has submitted counsels' and appraisers' statements and computer itemizations of those expenses for which reimbursement is sought, sufficient information is available for the court to verify these expenses.

## B

Old Stone's March 17, 1987 "Compliance with Order of Court ..." and March 20, 1987 "Addendum", together with attached supporting materials constitute that Bank's application for § 506(b) reimbursement. Those documents did not contain the "general narrative statement of the nature of services provided ..." required by Local Rule 20.[13] The computer time sheets sub-

---

**13.** The relevant portion of Local Rule 20, Local Rules of Bankruptcy Procedure provides that:

All applications for allowances to attorneys, trustees, accountants or examiners for services rendered or reimbursement of necessary expenses shall, in addition to the requirements set forth in the Bankruptcy Code and Bankruptcy Rule 2016(a), contain the following information:

(b) In concise form, a general narrative statement of the nature of the services provided, including the results obtained, the size of the estate, total amount of compensation sought, and any other matters which will assist the Court in determining the reasonable value of such services.

mitted, however, make it clear that Old Stone's involvement with the case from the outset tracked and duplicated the activities of Chase. From the summary Old Stone submitted, it appears the Bank neglected to include $4,300.00 in the $74,348.00 it claimed for fees. That amount will be added to the $6,592.00 listed in Old Stone's Addendum, so that its total claim is found to be $85,240.00 based upon 663 hours. The services claimed were performed between May 28, 1986 and March 20, 1987. In addition, Old Stone has requested $1,097.00 as reimbursement for expenses. The papers furnished by Old Stone have the same deficiency as those of Chase, but sufficient information is available for the court to find that those costs were incurred and are reasonable.

## C

Societe filed its "Partial Statement of Attorneys' Fees" on March 20, 1987. The statement covers fees and expenses of local counsel, Murtha, Cullina, Richter & Pinney ("Murtha") and Philadelphia based co-counsel, Dechert, Price & Rhoads ("Dechert"). Of the aggregate claimed fee of $77,798.00, representing a total of 684 hours, as to which each firm claims half, Murtha and Dechert seek $33,280.00 and $44,518.00, respectively. Services claimed were performed by Murtha between August 8, 1986 and March 20, 1987, while Dechert rendered services between June 16, 1986 and March 20, 1987.

Societe has not filed a "general narrative" as required by Local Rule 20. However, time sheets submitted, while containing numerous obliterated descriptive items, include sufficient information to enable the court to find that the services rendered by both co-counsel share the same characteristics as those rendered to the other Banks. Societe also seeks expenses of $2,915.00, and although its application is not in strict compliance with Local Rule 20, it is supported by sufficient documentation to support a finding that $2,745.00 of those expenses were incurred and are reasonable.

Reduced to tabular form, it thus appears that the Banks' request for reimbursement, as adjusted, is as follows:

|  | Hours | Fees | Expenses |
|---|---|---|---|
| Chase | 1,290 | $176,881.00 | $11,123.00 |
| Old Stone | 663 | 85,240.00 | 1,097.00 |
| Societe | 684 | 77,798.00 | 2,745.00 |
| Total | 2,637 | $339,919.00 | $14,965.00 |

For purposes of comparison, it is noted that the Banks' attorneys billed 1,492 more hours, or more than twice the amount of time spent by Wonder's attorneys (1,145 hours as compared to 2,637), although Wonder's attorneys had a much greater scope of activity. In fact, the Banks' attorneys spent 708 hours more than the combined time of the attorneys for Wonder, the Chapter 7 trustee, and the creditors' committees.

It is clear that creditors are entitled to engage counsel and pay for constant, comprehensive, and aggressive representation, but where services are not reasonably necessary or where action is taken because of an attorney's excessive caution or overzealous advocacy, courts have the right and the duty, in the exercise of their discretion, to disallow fees and costs under § 506(b). Indeed such activity might cross the line of conduct sanctionable under F.R.Civ.P. 11 and Bankr.R. 9011 if it is "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."

The *LeMarquis* court, *supra,* 65 B.R. at 724, observing that "the filing of a bankruptcy petition under any chapter broadly affects the 'rights' and 'powers' of all creditors, most notably due to the automatic stay," concluded that an oversecured creditor should not be compensated "for its attorney's fees for any action it takes in a bankruptcy proceeding under the guise that its rights have been affected." The court went on to disallow fees attributable to seeking relief from the automatic stay and relating to the debtor's disclosure statement and plan because it found that the secured claim was never threatened due to the large equity cushion. *Id.*

In *In re Masnorth Corp.,* 36 B.R. 335 (Bankr.N.D.Ga.1984) where a Chapter 11

plan proposed the cure and reinstatement of a mortgage pursuant to § 1124(2)(C),[14] the court held that while the secured creditor had the right to assert all bona fide claims, it was not entitled to "saddle the debtor with all the attorney's fees and expenses incurred so as to impede the debtor's ability to reorganize." *Id.* at 339.

In *In re W.S. Sheppley & Co.,* 62 B.R. 279 (Bankr.N.D.Iowa 1986), a creditor applied for $90,109.00 to cover attorney's fees and expenses incurred protecting its first mortgage in the debtor's principal asset. The court approved $38,278.00 attributable to the prepetition period which related to a foreclosure action eventually stayed by the bankruptcy petition but limited recovery of post-petition fees to $20,000.00 stating,

the full amount requested cannot be justified for allowance under [§ 506(b) ] provisions and precepts. The record in this case amply demonstrates that [the creditor], from the moment of the filing of the Chapter 11 petition, was determined to embark upon an "all-out-war" to oppose every effort or attempt by the debtor to proceed with its reorganization, notwithstanding the substantial equity cushion that protected [its] secured debt and assured its ultimate payment. A good part of the post-petition services had the effect of delaying, rather than hastening, the ultimate liquidation of the asset in question to permit repayment of '[the] debt.

In such circumstances, a substantial discount from hourly rate fees is justified to the extent the bankruptcy court finds the efforts were unnecessary to protect a legitimate interest of the secured creditor in the bankruptcy proceedings.

*Id.* at 282.

▆▆▆ Having observed the progress of this case since its commencement, and after considering activities of the Banks' counsel, particularly counsel for Chase, both in terms of the matters they initiated and those they opposed, I find a striking similarity between this case and what the courts in *LeMarquis, Masnorth* and *Sheppley* apparently observed.

An analysis of the 2,637 hours claimed by the Banks under § 506(b) must take into account that an action might arguably be allowable, in the sense that it is not expressly prohibited by law, but nonetheless be disallowed because, for example, the extent of oversecurity makes the effort redundant. Of equal importance in this analysis is a time and efficiency study to determine whether there was excessive inter- and intra-office duplication. On that latter note, it must be observed that, with the exception of a minor skirmish between Chase and Societe over a letter of credit, the Banks essentially shared a common if not an identity of interest as to which they took similar if not identical positions.

I determine that 900 hours must be disallowed as blatant and totally unproductive obstruction in the administration of this case, allocated as follows: Chase—515; Societe—297; and Old Stone—88. This time is attributable to motions for relief from the automatic stay; opposition to administrative expenses of the Chapter 7 trustee; opposition to the withdrawal of Wonder's original attorneys; services in connection with the disclosure statements and plans; time spent with respect to an inter-bank letter of credit dispute; time spent on a frivolous and procedurally flawed appeal from the court's scheduling order on § 503 and § 506(b) fees and expenses; and time spent by Societe on cash collateral matters.

None of those activities served any legitimate purpose. For example, since the Banks were always fully secured, their attempts to obtain relief from the automatic stay had no realistic chance of success, but Wonder was required to meet that challenge and, in addition, defend against the Banks' insistence that the estate pay their attorneys' fees for over 80 hours expended on that activity. Similarly, despite the fact that the Proponents proposed to pay the full amount of the Banks' allowed claims

---

**14.** Here the Proponents' amended plan calls for a full cash payment of the Banks' allowed se-
cured claims under § 1124(3).

on the effective date of the plan, the attorneys for the Banks performed in excess of 300 hours in connection with the disclosure statement and plan, the effect of which was to delay the process by which their clients were to be paid. They would have spent even more time but their efforts to present lengthy testimony at the disclosure statement and confirmation hearings were rejected on the basis that the disclosure statement needed no clarification, and as creditors, unimpaired as a matter of law, see § 1124(3), they had no standing to object to confirmation, *see* Memorandum of Decision, March 25, 1987. In addition, opposition to the Chapter 7 trustee's expenses, which have a lower priority than the Banks' secured claims and which are in any event *de minimis,* was unlikely to succeed and added nothing to the Banks' protection. Another example is found in Societe's regular attendance at cash collateral hearings, even though it is undisputed that this Bank had no interest in cash collateral other than in Wonder's rent receipts of approximately $2,000.00 per month. Societe's representation at cash collateral hearings caused it to be billed for 155 hours [15] and over $17,000.00 during the course of this case, arguably in connection with an interest probably not exceeding $16,000.00.[16]

A large number of the remaining 1,737 hours not only have strong overtones of unnecessary services but are also tainted by excessive duplication, both of which have resulted in grossly inflated fees.

The time sheets of the Banks' counsel are replete with duplication, including innumerable telephonic conferences between Banks' counsel, regular attendance by members of each counsel's firms at every court hearing, and numerous out-of-court conferences. Perhaps the most egregious example is furnished by Chase, whose attorneys appeared at 16 separate court hearings, all of which were attended by attorneys representing the other Banks, and on those 16 occasions, due to multiple representation, Chase was billed for the aggregate time of 40 attorneys. At a February 9, 1987 hearing, to illustrate further, four attorneys appeared and billed Chase for 60 hours and a total of $8,300.00. Old Stone was also represented at that hearing by two attorneys for a total of 27 hours, and Societe was represented by local counsel while Philadelphia counsel lists a line item reading in part "Attempt attending hearing re cash collateral." Since Philadelphia counsel billed a mere four and a half hours that day, one may assume that the "attempted attendance" failed. Although Chase was not represented by four billing attorneys at any other hearing, it was often represented by three, and Societe was often represented not only by local co-counsel, but by Philadelphia counsel as well. While Chase alleges an inter-creditor agreement with Old Stone which resulted in its taking a lead position, this agreement apparently failed to deter Old Stone from being broadly represented.

Counsel to Chase argues that because of the unauthorized sale of certain estate property to Dorcy International Inc., the Proponents lost credibility which justified increased legal activity on the part of the Banks. That argument is transparent. Although there is no question but that the failure to obtain court approval of the Dorcy sale was improper, there is also no question but that the Banks embarked upon a massive overreaction reflected in the activity only part of which has been recounted here. The Bank loans were not based on trust; they were fully secured by valid liens on collateral significantly in excess of the combined debt owed to the Banks, and as noted, that secured position was never in jeopardy at any time during the administration of this case.

While the Banks' attorneys contend that their efforts were aimed at getting their clients paid as soon as possible, their actions and the opposition they mounted

---

**15.** Proponent's Exhibit A.

**16.** This figure represents the estimated rents receivable in which Societe had an interest from the inception of this case through February 11, 1987, when, after notice and a hearing, an order entered granting Wonder's Renewed Second Motion to Use Cash Collateral.

clearly belie that goal. Evidence for that conclusion is found throughout this case, not the least of which is the continued resistance by the Banks even after the Proponents' plan was unveiled and disclosed that the Banks were to be paid the full amount of their allowed claims on its effective date. It is therefore not inappropriate for this court to ponder whether the asserted mistrust was not merely a guise for the real motive of the Banks' counsel to manage, orchestrate, and control Wonder's reorganization, including the amount that would be allowed as fees under § 506(b).

That perception is particularly compelling in view of a proposed pre-confirmation stipulation drafted by the Banks for which they unsuccessfully sought court approval on March 3, 1987. Beyond the unacceptable interference with the court's authority to control its docket and the case management of contested matters, the stipulation supports the conclusion that the Banks attempted to trade peace during the confirmation process for acquiescence by the Proponents not to dispute their request for the allowance of § 506(b) fees. This attempt went far beyond the level of negotiations appropriately aimed at achieving a consensual plan. In the context of an overriding and frequently expressed concern by the Proponents that their financing was contingent, *inter alia,* upon time constraints, paragraph 23 of the stipulation states in part:

> ... PROVIDED HOWEVER, that if objections are made as aforesaid by the proponents, or either of them, to such Section 506(b) claims on or before March 10, 1987, the Banks, or any of them, shall have the right, *anything in this Stipulation to the contrary notwithstanding,* to object to confirmation on March 18, 1987 on any ground. (emphasis in original).

It should further be observed that provisions in the stipulation concerning the Banks' right to be heard contemplated a presentation of "objections without restrictions" and "an unlimited opportunity for the presentation of evidence" was contemplated. *See, e.g.,* paragraphs 12 and 23.

A less aggressive approach by the Banks' counsel would, in my view, have led to a quicker resolution of the case, either by a successful public sale under Chapter 7, or swifter confirmation of a Chapter 11 plan. By their actions, the Banks' attorneys not only delayed the proposed payment to their clients, generating unreasonable fees and expenses in the process, but also caused Wonder to incur a considerable and largely unnecessary administrative expense.

In order to reduce the fees to a level allowable under § 506(b), the 1,737 remaining hours must be discounted by a factor of 66⅔% for Chase and Old Stone and by a factor of 75% for Societe. That computation yields the following result:

| | | | |
|---|---|---|---|
| Chase | 775–517 | = | 258 |
| Old Stone | 575–383 | = | 192 |
| Societe | 387–290 | = | 97 |
| | Total allowed hours | = | 547 |

For those hours, the court will allow $150.00 per hour, plus costs as follows:

1. Chase Manhattan Bank, N.A. (Robinson & Cole)

| | |
|---|---|
| Allowed fee | $38,700.00 |
| Allowed costs | 11,123.00 |
| Total allowed § 506(b) claim | $49,823.00 |

2. Old Stone Bank (Schatz & Schatz, Ribicoff & Kotkin)

| | |
|---|---|
| Allowed fee | $28,800.00 |
| Allowed costs | 1,097.00 |
| Total allowed § 506(b) claim | $29,897.00 |

3. Societe Generale (Murtha, Cullina, Richter & Pinney and Dechert, Price & Rhoades)

| | |
|---|---|
| Allowed fee | $14,550.00 [17] |
| Allowed costs | 2,745.00 |
| Total allowed § 506(b) claim | $17,295.00 |

AND IT IS SO ORDERED.

---

**17.** Fifty per cent to each firm.