In re **COURTLAND ESTATES CORPORATION, Debtor.**

**Bankruptcy No. 91–14235–JNG.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 21, 1992.

Paul J. Grella, West Roxbury, Mass., for debtor.

Alan B. Rubenstein, Rackemann, Sawyer & Brewster, P.C., Boston, Mass., for bank.

## MEMORANDUM

JAMES A. GOODMAN, Chief Judge.

### I. INTRODUCTION

There are presently two issues before the Court: 1) the rate of interest applicable to the oversecured claim of The First National Bank of Boston (the "Bank of Boston" or the "Bank"); and 2) the reasonableness of the attorneys' fees included in the secured claim of the Bank.

### II. FACTS

The parties submitted a "Stipulation Regarding the Secured Claim of The First National Bank of Boston" on April 13, 1992. The Stipulation incorporates rele-vant documents and contains the following material facts. On December 12, 1988, the Bank of Boston made a construction loan in the maximum amount of $990,000 to Courtland Estates Corporation (the "Debtor"). The loan is evidenced by a Promissory Note dated December 12, 1988 ("the Note") and a Construction Loan Agreement dated December 12, 1988. The loan is secured by a first mortgage ("Mortgage and Security Agreement") on all of the Debtor's real estate in Norton, Massachusetts.

The Note provides for interest at a floating rate equal to 1% above Bank of Boston's base rate up to the time of maturity of the loan. It also provides for interest on overdue principal at the fixed rate of 18% per annum, or if higher, at a floating rate equal to 4% above the base rate.

On July 20, 1990, prior to the Debtor's Chapter 11 filing but after several of the Debtor's condominium units had been sold and occupied, the Debtor informed Bank of Boston that it had not yet obtained approval of its proposed conservation restriction from either the Norton Planning Board or the Executive Office of Environmental Affairs. Bank of Boston contended then and continues to contend now that such approval was an express condition contained in the special permit for the development of the condominiums and for the issuance of occupancy permits for them. Therefore, according to the Bank, the Debtor was in default under paragraph 4.5 of the Construction Loan Agreement. Accordingly, Bank of Boston retained Rackemann, Sawyer & Brewster, P.C. to protect its interest in connection with the loan to the Debtor.

During the period of time between August, 1990 and December, 1990, Bank of Boston and the Debtor held several meetings to discuss the status of the project in light of the conservation restriction issue, the Debtor's efforts to obtain the required approval, Bank of Boston's decision to withhold additional disbursements of loan proceeds until the approval was obtained or until the loan was satisfactorily restructured, and possible amendments to the terms of the loan. Rackemann, Sawyer & Brewster represented Bank of Boston at

each of these meetings and during these discussions.

The loan matured on December 31, 1990. By letter dated January 30, 1991, Bank of Boston agreed to forebear until March 1, 1991 from the exercise of its legal remedies to collect on the loan.

On February 27, 1991, the Debtor commenced a civil action against Bank of Boston in Bristol Superior Court seeking damages in excess of $1 million arising out of the Bank's alleged breach of its obligations under the various loan documents. On March 7, 1991, prior to service of the complaint in the Bristol County action, Bank of Boston commenced an action in Suffolk Superior Court against the Debtor and Roger and Paul Precourt, the Debtor's principals, who individually guaranteed the loan, to collect the amount due under the Note. By order dated April 5, 1991, the Suffolk County action was consolidated with the Bristol County action. Rackemann, Sawyer & Brewster has represented Bank of Boston in connection with these consolidated civil actions from their commencement until the present time.

The Debtor filed its Chapter 11 bankruptcy petition on May 15, 1991. Rackemann, Sawyer & Brewster has represented the interests of Bank of Boston in connection with these bankruptcy proceedings from May 15, 1991 to the present.

At a hearing in these proceedings before the Honorable James N. Gabriel on May 28, 1991, Judge Gabriel instructed counsel for the Debtor and Bank of Boston to litigate the competing claims pending in the state court in the state court rather than in the Bankruptcy Court. Judge Gabriel advised counsel to file a stipulation for relief from the automatic stay.

With respect to the Debtor's obligations to the Bank, the remaining principal balance of the loan as of April 13, 1992 is $111,996.26. This amount reflects the application of a payment in the amount of $250,000 made by the Debtor to the Bank on February 27, 1992 pursuant to an order of the Bankruptcy Court dated February 25, 1992.

The amount of interest due and owing on the Note as of April 13, 1992, applying an interest rate equal to Bank of Boston's base rate plus 1% for the period of December 1, 1990 to February 28, 1991, and an interest rate of 18% per annum for the period of March 1, 1991 to April 13, 1992, is $78,180.05.

The amount of interest due and owing as of April 13, 1992, computed at a rate equal to Bank of Boston's base rate plus 1% per annum for the period of December 1, 1990 through April 13, 1992, is $44,002.25.

In its efforts to collect the amount of the loan, Bank of Boston incurred appraisal fees in the amount of $5,000, advertising and auctioneer fees in the amount of $6,001, and fees for the preparation of a hazardous waste site assessment report in the amount of $2,500. The Debtor does not dispute that these expenses are legitimate and reasonable.

In a motion to use cash collateral dated September 13, 1991 and filed with the Court, the Debtor valued its estate at $984,624.16, which amount consisted of the value of one completed unsold condominium unit valued at $120,000, the value of its remaining real estate, which was appraised at $481,000, and cash collateral in the amount of $383,624.16. In a separate motion for authority to sell property free and clear of liens, filed by the Debtor on or about October 30, 1991, the Debtor represented that the market value of its assets was approximately $1 million. It also stated that Bank of Boston was "an oversecured creditor."

At the present time, the Debtor's estate consists of cash collateral in the approximate amount of $311,827.14 and rights to develop 19 additional condominium units, which rights were appraised by the Debtor in June, 1991 as having a value of $24,000 per unit (or $456,000 for 19 units). The amount of cash collateral available is enough to pay the Bank its outstanding principal and interest at the default rate as well as substantially all of the legal fees paid by the Bank to Rackemann, Sawyer & Brewster.

During the period of August 1, 1990 through February 29, 1992, Bank of Boston incurred and paid legal fees in the amount of $172,696.25 and incurred an obligation for disbursements in the amount of $8,774.62 to protect its interests in connection with what it believed to be a default by the Debtor under the Construction Loan Agreement, to represent it in its discussions and meetings with the Debtor, to represent it in the civil actions in Suffolk and Bristol Superior Courts, and to represent its interest in the bankruptcy proceedings.

With respect to the Bank's claim for attorneys' fees, there are three separate agreements signed by the Debtor that provide for the recovery of attorneys' fees: the Note, the Construction Loan Agreement, and the Mortgage and Security Agreement. The Note provides: "The undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the holder in enforcing the Obligations of any Obligor." The Construction Loan Agreement provides:

> Borrower agrees as follows: 4.17 *Costs, Charges and Expenses.* To pay all costs, charges and expenses, including reasonable attorneys' fees, heretofore or hereafter incurred by Lender in connection with this Agreement, any Loan Document, any other document executed pursuant hereto, or in connection with the enforcement of Lender's rights thereunder.

The Mortgage and Security Agreement provides:

> 7.1 *Lender's Expenses* If Lender retains an attorney to collect any sums due under this Mortgage, enforce any of the provisions hereof, or otherwise protect Lender's interest, Borrower agrees to pay Lender, on demand, all costs and expenses in connection therewith, including all court costs and reasonable attorney's fees, whether or not suit is brought and prosecuted to completion, together with interest thereon at the rate applicable under the Note to amounts past due.

Daniel P. Corcoran, Jr., an Assistant Vice President of the Bank and the person primarily responsible for administering the Bank's loan to the Debtor, submitted an affidavit, to which the Debtor has not objected, in which he stated the following:

> When a loan remains unpaid after default or maturity, Bank of Boston incurs additional costs that are incapable of precise calculation. Those costs include administrative costs in the form of additional personnel responsible for overseeing the loan and additional attention required for the loan, including such additional tasks as conferring with counsel, attending workout negotiations, and attending court hearings. Bank of Boston also incurs additional financial costs with respect to non-performing loans in the form of their negative impact on the Bank's earnings. The additional amount of interest specified in the Note to be applied to overdue principal is intended, in part, to compensate Bank of Boston for those additional costs. The rate of 18% per annum applied to overdue principal is the standard "default rate" applied by major banks in Boston. Prior to becoming employed by Bank of Boston in June, 1990, I was employed by Bank of New England, N.A., which applied the same rate of interest on overdue principal, i.e. 18% per annum.

Corcoran also stated the following:

> I have reviewed the description of the legal fees and expenses charged by Rackemann, Sawyer & Brewster as itemized in its affidavit dated April 28, 1992. I am satisfied that those fees were necessary for the protection of Bank of Boston's interest in connection with the loan. All of the services rendered were performed at my direction or with my acquiescence.

Finally, two facts must be emphasized: 1) the Bank is an oversecured creditor within the meaning of 11 U.S.C. § 506(b) of the Bankruptcy Code; and 2) the Debtor presently has no unpaid pre-petition or post-petition debts, other than to insiders of the Debtor, to its attorneys, and to Bank of Boston. The Debtor paid its unsecured debts, without Court authority and in viola-

tion of the provisions of the Bankruptcy Code, during the pendency of this case.

## III. DISCUSSION

The two issues before the Court are readily resolved with reference to 11 U.S.C. § 506(b). That section provides in pertinent part:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). On its face, section 506(b) provides for interest on oversecured claims and *reasonable* fees, costs and charges.

### A. Default Rate of Interest

█ The Debtor relies upon *In re Laymon*, 117 B.R. 856 (Bankr.W.D.Tex.1990), for the proposition that the interest rate attributable to the Bank's oversecured claim should be calculated at the federal judgment rate. As this Court recently noted in *In re Wasserman*, 143 B.R. 312 (Bankr.D.Mass.1992), the district court's decision upholding the bankruptcy court's award of interest at the federal judgment rate in the Texas case was reversed by the Court of Appeals for the Fifth Circuit. *Matter of Laymon*, 958 F.2d 72 (5th Cir. 1992), *reh'g denied*, 964 F.2d 1145 (5th Cir.1992). The Fifth Circuit ruled that the bankruptcy court misinterpreted *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), when it determined that the issue of interest was unrelated to either the existence or intent of the underlying contractual agreement. 958 F.2d at 74 ("There is nothing in the *Ron Pair* decision that leads us to believe that the Supreme Court intended to speak to the *rate* of interest under § 506(b)."). The court of appeals recognized a flexible approach to the issue. Accordingly, it remanded the case for an examination of the equities. However, it noted that "[p]rior to the enactment of the Code, the majority of courts utilized the contract rate of interest when allowing an oversecured creditor to collect post-petition interest pursuant to § 506(b)." *Id.* at 75.

This Court utilized the contract rate of interest in *In re White*, 88 B.R. 494 (Bankr. D.Mass.1988), a case in which this court allowed calculation of interest on oversecured claims with reference to the default rates set forth in the agreements of the parties.[1] Accordingly, this Court will permit the calculation of interest on the Bank's overdue principal at the rate specified in the Note. The rate Bank of Boston seeks to apply is within the range of default rates typically charged by commercial banks in Boston. As the Debtor has paid all pre-petition unsecured creditors without court authority, the equities of the case do not compel a different result. Indeed, use of the federal judgment rate would merely provide an undeserved windfall to the Debtor.

### B. The Reasonableness of the Fees

Pursuant to the terms of the agreements under which Bank of Boston's claim arises, the Bank clearly is entitled to reasonable attorneys' fees. Moreover, the affidavit of Daniel P. Corcoran, Jr. reveals that the Bank relied upon Rackemann, Sawyer & Brewster to counsel it and guard its interest with respect to environmental permit violations, foreclosure proceedings, workout negotiations, state court litigation and the pending bankruptcy proceeding.

█ The Debtor objects to the Bank's fees on a variety of grounds. For example,

---

1. In a decision reached the same day and in the same case, *In re White*, 88 B.R. 498 (Bankr. D.Mass.1988), this Court refused to sanction a contractual default rate of 48% per annum, finding such a rate "unconscionable" under any circumstances.

the Debtor maintains that the Bank's claim for fees is inflated due to duplicative efforts by various attorneys and excessive amounts of time spent on research and drafting. The Debtor also objects on grounds that the Bank's application fails to comply with Federal Rule of Bankruptcy Procedure 2016(a) and Local Rule 34(A)(1)(c), (2)(c) and (d). The Debtor notes that Rackemann, Sawyer & Brewster "lumped" time entries and consequently failed to describe specifically the services rendered. Moreover, the Debtor, citing, *inter alia, In re Wonder Corp. of America,* 72 B.R. 580 (Bankr.D.Conn.1987), *aff'd,* 82 B.R. 186 (D.Conn.1988), and *In re W.S. Sheppley & Co.,* 62 B.R. 279 (Bankr. N.D.Iowa 1986), argues that the Bank's fees cannot be considered reasonable because the Bank embarked upon an "all-out war to oppose every effort of the Debtor to proceed with its reorganization" and objected to and obstructed all of the Debtor's reorganization efforts.[2]

█ In *Wonder Corp., supra,* the court quoted extensively from *Matter of Salisbury,* 58 B.R. 635 (Bankr.D.Conn.1985). In that case, the court stated:

[T]he factors involved in a § 330 determination need not be the identical factors used by a court in deciding reasonable fees under § 506(b). As emphasized by the *United Merchants* court, "claims for collection costs are based in contract and are independent of statutory compensable administrative expenses for services rendered to the estate.... Collection costs claims ... are not subject to the statutory limitations on reimbursement for expenses of administering the estate." 674 F.2d at 138–139. Furthermore, the court indicated in such cases state law will apply to determine reasonable fees. 674 F.2d at 139.

*Matter of Salisbury,* 58 B.R. at 640 (additional citations omitted). The *Wonder*

*Corp.* court also quoted from *In re United Merchants and Manufacturers, Inc.,* 674 F.2d 134 (2nd Cir.1982), a case in which the court held that "[t]he controlling inquiry is whether, considering all relevant factors including duplication, the creditor reasonably believed that the services employed were necessary to protect his interest in the debtor's property." 674 F.2d at 140. Based upon its review of the case law, the *Wonder Corp.* court determined that the reasonableness of legal fees under § 506(b) should be assessed with reference to the following factors:

1. The legal services must be authorized by the loan agreement;

2. They must be necessary to promote the client's interest;

3. They must be permitted under applicable law, including the Bankruptcy Code;

4. They must be compatible with bankruptcy policy as derived from relevant provisions of the Bankruptcy Code and the judicial decisions which construe it;

5. The time spent must be appropriate to the complexity of the task;

6. The hourly rate must be appropriate under applicable bankruptcy standards;

7. The task must be assigned to the fewest and least senior attorneys able to render the service in a competent and efficient manner;

8. The fee should be adjusted to reflect duplicative services rendered by attorneys representing other parties with a common interest in the case; and

9. The fee should be adjusted to reflect the court's observation of the nature of the case and the manner of its administration.

72 B.R. at 588–89.

█ This Court has examined the fee application, submitted by way of an affidavit from Rackemann, Sawyer & Brewster,

---

**2.** During these Chapter 11 proceedings, the Debtor made representations to the Bank and to the Court, on the record, that it was holding the proceeds from the sales of condominium units, proceeds subject to the Bank's valid Mortgage and Security Agreement, in escrow. Later, the Debtor admitted that a portion of these funds were used improperly to pay all pre-petition unsecured creditors in full. In view of this conduct the artillary used by the Bank in its "all-out war" was justified. Indeed, the Court is of the opinion nuclear warfare may have been warranted under the circumstances of this case.

in conjunction with the Bank's oversecured claim in light of the factors identified above. The application is broken down into eight separate categories for which the following amounts were charged to and paid by the Bank: 1) Permitting Violations–$7,554.54; 2) Workout Negotiations–$18,934.01; 3) Default Notices and other Communications with the Debtor–$8,157.09; 4) Foreclosure Proceedings–$24,759.47; 5) Suffolk County Proceedings–$8,072.56; 6) Bristol County Proceedings–$41,214.71; 7) Bankruptcy Proceedings–$57,566.33; and 8) Misuse of Cash Collateral–$6,437.54. The Court has focused on the category labelled "Bankruptcy Proceedings," and the categories involving the state court litigation, as the vast majority of time spent in the remaining categories was incurred pre-petition, and the fees are not unreasonable. Moreover, the Debtor did not object to the fees in these categories as strenuously, nor did it object to the fees incurred relative to its admitted misuse of the Bank's cash collateral.

With respect to the bankruptcy proceedings, the firm charged the Bank $57,566.33, although its total fees were $60,426.25. The Court's review confirms that the Debtor's analysis of the fee application is not without some merit. In particular, the Court notes the application reflects an excessive amount of time spent by both junior associates and senior partners doing research, particularly research related to the use of cash collateral. Moreover, there are numerous instances of duplicative charges for conferences. Additionally, the number of hours billed by senior partners at rates of $190 per hour and up appears excessive and unreasonable in view of the complexity of the case. However, because the Bank's suspicions about the Debtor's post-petition conduct proved to be well founded, the Court cannot but conclude that the Bank, to paraphrase the *United Merchants* court, "reasonably believed that the services employed were necessary to protect [its] interest in the debtor's property." 674 F.2d at 140. Accordingly, the Court will reduce the amount of the Bank's claim for reimbursement of attorneys' fees in category 7 by fifteen percent. With respect to the fees incurred in categories 5 and 6, the Court hereby directs that those sums shall be held by counsel to the Debtor and counsel to the Bank in a joint interest-bearing escrow account pending the resolution of the state court litigation. If the Bank prevails in the litigation, those fees shall be part of its secured claim. If the Debtor prevails, the monies in escrow can be disbursed pursuant to the orders of the state court judge overseeing the case. Nevertheless, in light of the factors enunciated by the court in *In re Wonder Corp. of America, supra,* particularly as to the ninth factor, the Court will not reduce the fees of Bank's counsel to the extent requested by the Debtor.

## IV. CONCLUSION

The Bank is hereby ordered forthwith to file a proof of its secured claim in accordance with this decision. The foregoing shall constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. An appropriate order shall issue.

## ORDER

In accordance with the memorandum dated August 21, 1992, the Court hereby allows The First National Bank of Boston to calculate its claim using the default rate of interest set forth in the agreements between the parties. The Bank shall be allowed reimbursement of fees and expenses and shall file forthwith a proof of its secured claim, in accordance with the memorandum, which upon receipt shall be allowed by the Court and promptly paid by the Debtor.