In the Matter of TERRY LIMITED PARTNERSHIP, Debtor.

Bankruptcy No. 90–30864–RKR.

United States Bankruptcy Court, N.D. Indiana, South Bend Division.

March 31, 1993.

, Jeffrey E. Kehl and Edward Benchik, South Bend, IN, for Invex Holdings, N.V. and Invex Finance, B.V.

Michael B. Watkins, Barnes & Thornburg, South Bend, IN, for Equitable Life Ins. Co. of Iowa.

Alex Edgar, Asst. U.S. Trustee, South Bend, IN.

William A. Thorne, Thorne, Grodnik, Ransel, Duncan, Byron & Hostetler, Elkhart, IN, for debtor.

## DECISION and ORDER

ROBERT K. RODIBAUGH, Bankruptcy Judge.

This matter is before the court on OBJECTION TO CLAIM OF EQUITABLE LIFE INSURANCE COMPANY OF IOWA, which was filed by Invex Holdings, N.V. and Invex Finance, B.V. (referred to jointly as "Invex") on October 6, 1992. Equitable Life Insurance Company of Iowa filed its response on October 15, 1992. A hearing was held on December 21, 1992. Both parties subsequently filed briefs, and the matter was taken under advisement on February 22, 1993. Invex objects to the claim of Equitable Life Insurance Company of Iowa to the extent that such claim is for post-petition interest calculated at the contractual default rate.

### Jurisdiction

This decision shall represent findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rules of Bankruptcy Procedure 7052 and 9014. This

matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), over which the court has jurisdiction pursuant to 28 U.S.C. § 157(b)(1).

*Background*

Invex Finance initiated this bankruptcy proceeding by filing an involuntary Chapter 11 petition against Terry Limited Partnership ("Debtor" herein) on April 27, 1990. Debtor consented to the proceeding, and an Order for Relief was entered on June 12, 1990.

In December 1983, Debtor purchased the Society Bank Building, located in South Bend, Indiana, from Invex Finance, granting Invex Finance a wraparound mortgage which was subordinate to and encompassed a first mortgage on the building held by Roosevelt Savings Bank ("Roosevelt"), a second mortgage held by Equitable Life Insurance Company of Iowa ("Equitable"), and a wraparound mortgage held by Invex Holdings, N.V.[1] The Society Bank Building was Debtor's major asset.[2] By order dated November 22, 1991, the court found the value of the building to be $5,350,000. Both Roosevelt and Equitable had oversecured claims.

Roosevelt, Equitable, and Invex are the primary creditors in this bankruptcy proceeding. Only Invex and the Indiana Department of Revenue have filed proofs of claim. The Indiana Department of Revenue's claim is less than $500. Equitable's claim arises from a June 1, 1984 promissory note in the principal amount of $2,100,000 executed by the Debtor in Equitable's favor, and secured by a mortgage on the Society Bank Building.[3] Under the terms of the promissory note Debtor was to pay interest on the debt at the rate of $14\frac{1}{4}\%$ per annum, and, in the event of default at the rate of $17\frac{1}{4}\%$ per annum.[4] The note was originally payable on February 1, 1990, but, at the request of the Debtor, extended to April 1, 1990. The Debtor defaulted on the note by failing to pay the principal balance and deferred interest by April 1, 1990.

Debtor's promissory note to Invex Holdings called for interest at the rate of 17.25% per annum, and matured in December 1987. Debtor's wraparound note to Invex Finance provided for interest at the rate of 17.5% per annum, and also matured in December 1987. The Debtor defaulted on both notes.

After Invex filed its involuntary petition against Debtor, Debtor filed a proposed plan of reorganization which was predicated upon obtaining a loan from some third party in an amount not less than $3,330,000. Debtor was negotiating for a loan commitment with ITT. Invex Finance, which had submitted its own proposed plan of reorganization, filed its objection to Debtor's plan. Equitable and the Debtor then reached an agreement which was approved by the court on June 10, 1992 ("Stipulated Agreement"), and which was not objected to by Invex.

Under the Stipulated Agreement, Equitable promised to compromise the amount of its claim as well as the rate of interest accruing from December 1, 1991. Equitable additionally agreed not to object to Debtor's plan of reorganization. Equitable's agreement with Debtor was conditioned upon Debtor (1) making adequate protection payments when due, (2) obtaining the necessary loan commitment by September 1, 1992, (3) receiving a final, nonappealable order of confirmation by September 1, 1992, and finally, (4) payment in full to Equitable by October 1, 1992. Debtor would be considered in default if it failed to comply with any one of the four

---

1. Invex Finance is a wholly owned subsidiary of Invex Holdings, N.V. The Society Bank Building had been sold to Lake County Trust Company as trustee under a trust agreement. Invex Holdings, N.V. was the beneficiary of the trust. Invex Holdings, N.V. sold its interest in the building to Invex Finance. On the same day Invex Finance proceeded to sell its newly purchased interest in the building to Debtor. Invex Finance realized a profit of $774,000 on this resale.

2. As a practical matter this was a single asset case.

3. The promissory note restates a prior loan made to the Debtor by Cohen Financial Corporation which was subsequently assigned to Equitable.

4. The promissory note also called for Debtor to make monthly payments in an amount less than the accruing interest. At the time the note matured, Debtor was to pay the principal amount and the accrued but unpaid interest.

conditions. The parties further agreed that if Debtor should default, after notice to the court, Equitable would be entitled to have the automatic stay lifted and the Society Bank Building abandoned from the estate, or to have the building sold pursuant to 11 U.S.C. § 363. In addition, Equitable's claim would consist of the outstanding principal balance, the unpaid deferred interest which had accrued to the date of maturity, interest accruing at the default rate after maturity, and attorney's fees and costs.

On September 1, 1992, Debtor had neither obtained the requisite loan commitment nor received an order of confirmation. As a result of Debtor's default, the court ordered the Society Bank Building sold at public auction to the highest bidder. At the auction held on December 21, 1992, the building was sold to Invex Holdings for $4,005,001. Roosevelt's claim was paid from the proceeds of the sale. Equitable's claim, calculated at the contract rate of interest, was also paid. Excess proceeds in the amount of $170,800 were segregated and deposited with the Debtor. This amount represents the difference between interest accrued from the date of maturity to the date of sale on Equitable's outstanding balance calculated at the contract rate of 14¼% per annum and calculated at the default rate of 17¼% per annum.[5] The Debtor makes no claim to these funds. Invex argues that Equitable's claim should be calculated at the contract rate of 14¼%, since applying the default rate would be inequitable to Invex and other inferior creditors.[6]

5. The amount owed to Equitable as of December 15, 1992, calculated at the default rate was $3,153,194.81. Calculated at the contract rate the amount owing was $2,982,394.81.

6. Invex originally contended that Equitable's claim should be calculated at the federal judgment rate, but now agrees that Equitable should receive the contract rate of 14¼%.

7. Equitable states "(C)ourts applying Code section 506 consistently and uniformly hold that an oversecured creditor is entitled to claim and receive interest at the higher default rate specified in the agreement from which the claim arose unless the equities dictate application of the lesser contract rate." [Equitable's memorandum filed January 20, 1993, at 7.]

## Discussion

■ There is no dispute that Equitable is an oversecured creditor entitled to interest under § 506(b) which states:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b) (Callaghan 1992–93). The parties also agree that generally courts do not rigidly apply or deny the default rate, but make the determination after considering the equities of the case.[7] The court, having reviewed the case law, agrees with this position[8] and, after analyzing the equities in the present case, concludes that Equitable is entitled to receive interest at the default rate of 17¼%.

Invex cites *In re Sheppley & Co.*, 62 B.R. 271 (Bankr.N.D.Iowa 1986) to support its opinion that "courts have devised an equitable two part analysis when deciding which interest rate should apply." [Invex's memorandum at 6.] Invex argues that under the *Sheppley* test the court should determine the risk of nonpayment which the oversecured creditor faced, and determine the interest rates prevailing in the relevant market during the pendency of the bankruptcy. However, the court does not agree that *Sheppley* has set forth a blanket "test" to be applied in all cases. Rather, the *Sheppley* court simply

Invex states "(A) bankruptcy court has the equitable power to modify a contract provision that calls for the assessment of a higher interest rate on the oversecured creditor's claim when the award of the higher rate would adversely impact the distribution of a bankruptcy estate's assets to other creditors." [Invex's memorandum filed January 21, 1993, at 5.]

8. The Supreme Court has stated that "(i)t is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditor and debtor." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946).

considered the above to be pertinent factors in that particular case. *Id.* at 278. In fact, the *Sheppley* court described five, rather than only two, factors which it considered germane to its determination.

■ When deciding whether equity requires that a contractual default rate should not be utilized, there is no hard and fast rule or standard test to apply which governs the decision.[9] In each case the court must look to all of the circumstances existing in that particular case. *See Matter of Laymon,* 958 F.2d 72 (5th Cir.1992); *In re Hollstrom,* 133 B.R. 535, 539 (Bankr.D.Colo.1991) (acknowledging that under certain circumstances equity warrants deviating from the contractual default interest rate, but noting that "there is no clear, emerging, definite enumeration of these special circumstances or equitable considerations"). While the court took *Sheppley* into account, it did not consider the *Sheppley* factors conclusive in the present case.

■ The 17¼% interest rate is not unreasonable, and, at the time Debtor obtained the loan, was well within the range of rates being charged by other lending institutions. Mr. Schefmeyer, who testified on behalf of Invex, reported that default interest rates are commonly found in loan documents, and that the default rate is often expressed as a percentage increase over the contract rate. Mr. Schefmeyer further testified that default rates are generally 2½ to 4½ percent over the contract rate. Equitable's default rate is 3% greater than its contract rate, and so falls well within the customary range described by Mr. Schefmeyer. The standard practice of charging a higher interest rate after default is designed as an incentive to the debtor to make timely payments. However, its second purpose is to compensate the lender for any loss resulting from the default such as increased expenses administering the loan and delayed use of the money. The lender's loss on any given defaulted loan will rarely be exactly the additional amount received by charging interest at the default rate. Some-

times the loss will be greater, and sometimes less. A lender cannot know at the time it extends a loan the exact amount of loss it will suffer in the event of a default. Instead, the lender relies on a default interest rate which it has determined is a reasonable approximation of its potential loss. When the differential between the contract and default rates is not excessive and falls within the usual and customary range, it is legitimately related to the purpose for which it was designed and should not be construed as a burdensome or unconscionable penalty. *E.g., In re Schaumburg Hotel Owner Ltd. Partnership,* 97 B.R. 943, 951 (Bankr.N.D.Ill.1989); *In re White,* 88 B.R. 494, 498 (Bankr.D.Mass.1988); *In re Skyler Ridge,* 80 B.R. 500, 511 (Bankr. C.D.Cal.1987). *Cf. Matter of Timberline Property Development, Inc.,* 136 B.R. 382 (Bankr.D.N.J.1992) (finding that a 3% increase upon default was unenforceable under New Jersey state law as a penalty where the lender testified that the higher rate was designed to coerce prompt payment). Invex would have the court deprive Equitable of interest payments calculated at a reasonable default rate of 17¼% in order that Invex might realize more on its own claim calculated at its regular contract rate of 17.25% (Invex Holdings)/17.5% (Invex Finance). The court is satisfied that equity does not require such a result.

"The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." *Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company,* 791 F.2d 524, 527 (7th Cir.1986). No creditors other than Invex will be affected by awarding Equitable its default rate. This is not a situation where numerous creditors, who have unexpectedly found themselves in a low priority unsecured position, are facing a minimal payment, or no payment at all. Invex knew at the time it entered into its transaction with the Debtor that its collateral was already encumbered by

---

9. A creditor's right to receive interest at either the contract or default rate may be altered in bankruptcy. However, the right itself is created by state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Thus,

before the bankruptcy court proceeds with its equity analysis, the creditor must have a right to the subject interest rate enforceable under state law. There is no dispute that Equitable has such a right.

two senior liens. It most likely also knew the extent of Debtor's obligation to the senior creditors, including the rate of interest being charged by each of them. In an arms length transaction Invex bargained for its third place position. The evidence does not suggest that the value of the Society Bank Building plummeted dramatically subsequent to Invex extending its loan to Debtor, and therefore, Invex has always been only a partially secured creditor.[10] Outside the bankruptcy context, had Equitable foreclosed immediately after the Debtor defaulted, Roosevelt and Equitable would have been paid in full before Invex received any payment. The bankruptcy proceeding has not changed the relative position of the parties. The court may diminish one creditor's bargained for rights in order to protect a second creditor's bargained for rights. There is nothing equitable, however, in diminishing one creditor's bargained for rights in order to augment the rights bargained for by a second creditor.

The court has also considered the effect of the Stipulated Agreement on the present dispute. Under the Stipulated Agreement Equitable promised to compromise its claim and refrain from objecting to Debtor's proposed plan of reorganization on the condition that Debtor obtained financing and a confirmed plan within certain time limits. In consideration for Equitable's promise, the Debtor agreed that if it could not meet the time limitations, Equitable would be entitled to its full claim, including interest at the default rate. This Stipulated Agreement was approved by the court and became binding on the parties. Invex neither objected to the Stipulated Agreement, nor appealed the court's order approving the Stipulated Agreement. Equitable originally bargained for a 17¼% default interest rate. Invex, knowing that there was a senior lien on the Society Bank Building and that the lienholder was entitled to interest at the default rate of 17¼% per annum, nevertheless granted Debtor a loan and accepted its position as

junior lienholder on the building. Equitable bargained a second time for the 17¼% default rate, and Invex failed to object. Had Invex objected, and had the court found that Equitable could not claim the 17¼% interest, the terms of the Stipulated Agreement would have been altered. Equitable would have had the opportunity to withdraw from the agreement as altered. The court is not inclined to now revise the rights and obligations created by the Stipulated Agreement, approved by the court, and depended upon by Equitable.

Accordingly, the court will deny Invex's objection to Equitable's claim, and authorize the Debtor to release to Equitable the excess sale proceeds of $170,800 which Debtor has been holding pending resolution of this dispute. It is

SO ORDERED.

---

**10.** Debtor's wraparound promissory note in favor of Invex Holdings was in the principal amount of $5,171,000. However, since it was negatively amortized, the balance owing at maturity was $6,161,304. The original principal amount of Debtor's wraparound promissory note to Invex Finance was $5,945,000. This note was also negatively amortized so that the amount owing at maturity was $7,043,376.