In re Anna KALIAN, Debtor.

FISCHER ENTERPRISES,
INC., Movant,

v.

Louis GEREMIA, Esq., Trustee,

and

Anna Kalian, Debtor.

Bankruptcy No. 92–13641.

United States Bankruptcy Court,
D. Rhode Island.

Feb. 1, 1995.

Michael C. Gilleran, Shafner & Gilleran, Boston, MA, for Fischer Enterprises, Inc.

John Boyajian, Boyajian, Harrington & Richardson, Providence, RI, for debtor Anna Kalian.

Deena Christelis, Cuzzone, Geremia & Civittolo, Providence, RI, for Trustee Louis Geremia.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.*

Fischer Enterprises, Inc. ("Fischer"), an oversecured creditor, seeks an order compelling the trustee to disburse, subject to available funds, fees, costs and default interest associated with its claim.

For the reasons set forth below, the motion is granted in part and denied in part.[1]

## BACKGROUND

On May 11, 1992, Anna Kalian ("Kalian" or the "debtor") borrowed $40,000.00 from Rhodes Financial Services, Inc. ("Rhodes"). Fischer succeeded to Rhodes' position by assignment dated June 11, 1992.[2] Kalian's

---

* For the District of Maine, sitting by designation.

1. This matter has been submitted on an agreed record. This memorandum sets forth the court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052 and 9014.

Unless otherwise indicated, all references to statutory sections, to the "Code" or to the "Bankruptcy Code" are to the Bankruptcy Re-

form Act of 1978, as amended, 11 U.S.C. § 101, *et seq.*

2. In October 1989 Fischer agreed to fund mortgage loans arranged and serviced by Rhodes. Exhibit A to Fischer Enterprise's Reply Memorandum in Support of Fee Application. When Fischer experienced trouble in its relationship

obligation was evidenced by a promissory note and secured by a mortgage on a single parcel of Massachusetts realty ("Seekonk property").

The note called for monthly "interest only" payments at 15.99% of principal for three months, at 18.00% thereafter and for a final balloon payment due on May 15, 1994. It also provided:

> The undersigned agree(s) to pay all costs and expenses, including all attorneys' fees, for the preparation of all documents relating to the loan arrangement between the mortgagor and the mortgagee, including without limitation, the mortgage and note of even date, and all costs and expenses, including all attorneys' fees, incurred in connection with the collection of this Note upon default. In addition, the undersigned agree(s) to pay all costs and expenses, including all attorneys' fees, in connection with any and all litigation involving the legality and/or enforceability of this Note. The undersigned shall pay to the Note Holder a late charge equal to one percent of the outstanding principal balance, when any monthly installment is not received by the Note Holder within five (5) days of the due date. In the event that the undersigned fail(s) to make a monthly installment in a timely manner, in accordance with the terms of this Note, then on the fifteenth (15th) day following the due date, the undersigned shall pay interest on the outstanding principal amount hereunder at the adjusted rate ("Adjusted Rate") of three percent (3%) per month. The undersigned also agree(s) that, upon the occurrence of an Event of Default, as described hereunder, the undersigned will pay interest on the outstanding principal amount due hereunder (pursuant to the terms

hereof, by acceleration or otherwise) at the rate of three percent (3%) per month until paid in full. The interest rate of the loan following an Event of Default, or at the Adjusted Rate, will not exceed thirty-six percent (36%), or the maximum rate allowable by the law in the Commonwealth of Massachusetts.

Promissory Note at 2. Failure to make a monthly payment within thirty days of the due date constituted an "Event of Default," as did Kalian's bankruptcy.

Kalian timely made the first seven monthly payments. On December 28, 1992, she filed a voluntary Chapter 11 petition. Monthly payments ceased for a time thereafter. From June 15, 1993, through July 15, 1994, Fischer received $7,449.00 in irregular payments.[3] A Chapter 11 trustee was appointed on August 13, 1993.

In late July 1994, the trustee sold the Seekonk property for $80,000.00, netting $68,985.28 after costs of sale. He immediately paid Fischer its principal and accrued interest at the note's base (non-default) rate (18%), totalling $48,190.00. Fischer accepted the payoff, reserving its right to seek payment of fees, late charges and default interest.

Subsequently, Fischer sought another $36,339.00, consisting of attorneys' fees and expenses ($16,019.00), late charges ($8,000.00) and default interest ($12,320.00). The trustee objected.[4] Following hearings, Fischer dropped its request for late charges and agreed that the trustee would be paid a commission from the sales proceeds. It continues to press its demand for default interest and legal fees, payment of which will consume the entire balance of funds remaining from the sale.[5]

---

with Rhodes, it obtained an assignment of the Kalian note and mortgage so that it could pursue collection directly. The context is significant in relation to Fischer's request for legal fees. *See* discussion *infra*, at 318–19.

**3.** Fischer received $533.00 payments in June, July and August, 1992; $600.00 payments in September, October, November and December, 1992, and in June, July and August 1993; and a $1,050 payment in January, 1994. It received no payments in other months.

**4.** The debtor joins in the trustee's objection. For simplicity sake, however, this memorandum will refer to both objecting parties as the "trustee."

**5.** Fischer and the trustee have agreed that even if Fischer prevails on each of its remaining requests (totalling $28,339.00), as much as a $4,200.00 may be paid the trustee as a commission.

## DISCUSSION

### 1. Issues of Interest.

Fischer asserts that the Bankruptcy Code provides no authority to modify its contractual entitlement to default rate interest in the postpetition period. According to Fischer, the debtor entered into an arm's length bargain that included the default rate term, that term is lawful under applicable state law and, therefore, the estate is bound by it.[6]

The trustee accepts, and in fact has paid, the 18% "base rate" interest on Fischer's claim. He only challenges Fischer's right to "default rate" interest (at 36%), asserting that the default interest term is excessive and, in reality, a "late charge" subject to a statutory reasonableness limitation. He argues that, throughout the bankruptcy proceeding, Fischer's claim was fully protected by the value of the mortgaged premises and that, under the circumstances, Fischer may not enforce the contract term doubling the interest rate on account of payments defaults.

### a. General Principles—§ 506(b).

■ The question whether a secured creditor is entitled to postpetition interest is one of federal law. *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *Debenture-holders Protective Committee v. Continental Inv. Corp.,* 679 F.2d 264 (1st Cir.), *cert. denied sub nom. Glen Corp. v. O.C. Associates,* 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982). Section 506(b) governs that right:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees,

costs, or charges provided for under the agreement under which such claim arose.[7]

In a recent New Hampshire case, Judge Yacos observed:

> As a general rule, interest on prepetition claims stops accruing as of the date of the filing of the bankruptcy petition. *In re D.C. Sullivan & Co., Inc.,* 929 F.2d 1, 2 (1st Cir.1991). The exception to this rule is the oversecured creditor who holds a claim with a "security cushion" in the collateral sufficient to cover both the principal and postpetition interest. *United Savings Ass'n. v. Timbers of Inwood Forest,* 484 U.S. 365, 372 [108 S.Ct. 626, 631, 98 L.Ed.2d 740] (1988). Under § 506(b), the oversecured creditor is entitled to postpetition interest on their claim until payment of their claim or until the effective date of the plan. *Rake v. Wade* [—— U.S. ——, ——], 113 S.Ct. 2187, 2190 [124 L.Ed.2d 424] (1993); *In re Laguna,* 944 F.2d 542, 544 (9th Cir.1991), *cert. denied* [503 U.S. 966], 112 S.Ct. 1577 [118 L.Ed.2d 219] (1992).
>
> The Supreme Court has held that the language of § 506(b) entitles holders of both consensual and nonconsensual oversecured claims to postpetition interest on their claim. *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235 [109 S.Ct. 1026, 103 L.Ed.2d 290] (1989)....  The question of what rate of interest applies, which is the question before the court today, has not been addressed by the Supreme Court. Likewise, there is no consensus among the courts on what the § 506(b) rate of interest should be based upon.

*In re DeMaggio,* 175 B.R. 144, at 147 (Bankr. D.N.H.1994) (footnote omitted).[8]

### b. Postpetition Interest on Nonconsensual Lien Claims.

*DeMaggio* addressed the postpetition, preconfirmation interest rate payable on an ov-

---

**6.** The trustee does not contend that the note's interest terms are unenforceable under principles of contract law (*e.g.,* adhesion contract, unenforceable liquidated damages) or debtor/creditor law (*e.g.,* truth-in-lending, usury).

**7.** Fischer's agreement regarding the trustee's commission aside, there is no issue regarding a § 506(c) surcharge here.

**8.** The § 506(b) issue is one of postpetition, rather than plan, interest rates. The latter question is altogether distinct and is governed by other provisions and principles. *See* §§ 1129(b)(2)(A)(i)(II); 1325(a)(5)(B)(ii). *See also In re DeMaggio,* 175 B.R. at 150 (Chapter 13); *In re Computer Optics,* 126 B.R. 664 (Bankr. D.N.H.1991) (Chapter 11).

ersecured, nonconsensual (*i.e.* tax lien) claim. In such cases, the issue is generally whether a statutory interest rate, or some other rate, should apply. *See also, e.g., Wasserman v. City of Cambridge,* 151 B.R. 4 (D.Mass.1993); *In re Schneider,* 162 B.R. 199 (Bankr. E.D.Wisc.1993).

■ Although there may be a specific statutory provision setting the state law interest rate for such liened claims, that rate does not necessarily control in bankruptcy proceedings. *In re DeMaggio,* 175 B.R. at 148 (collecting cases). The court exercises its discretion to set interest on oversecured, involuntary lien claims at a rate that balances appropriately the interests of the lien claimant and those of junior creditors. *See, e.g., Wasserman,* 151 B.R. at 6 (tailoring postpetition rate to protect secured creditor, but not to enrich it at the expense of other creditors); *In re DeMaggio,* 175 B.R. at 148 (recognizing Code, rather than state law, as the " 'genesis of an oversecured creditor's entitlement to interest out of estate assets, regardless [of] the source of the lien' ") (quoting *In re Kelton,* 137 B.R. 18, 20 (Bankr.W.D.Tex.1992)); *In re Schneider,* 162 B.R. at 201 (characterizing statutory 18% rate as "penalty" in light of market rates and noting that, because the estate was insolvent, unsecured creditors were objects of the punishment).

As the *Wasserman* court explained:
One of the principal objectives of the bankruptcy laws is to achieve the equitable distribution of an estate's assets among all creditors. *In re Kelton,* 22 B.C.D. 936, 938 (Bankr.W.D.Tex.1992); *In re Morrissey,* 37 B.R. 571, 574 (Bankr.E.D.Va.1984). To that end, a court's job is to determine the rate of post-petition interest that will treat all creditors most fairly. To make that determination a court must examine the equities and determine the post-petition rate in light of the facts of the particular case. *In the Matter of Laymon,* 958 F.2d 72, 75 (5th Cir.1992).

151 B.R. at 5. *See also In re D.C. Sullivan & Co.,* 929 F.2d at 5–6.

Thus, where there is no underlying contractual interest rate provision (but even where there is an applicable state statutory rate), the bankruptcy court has discretion to set an interest rate equitably appropriate to the circumstances of each case.

   *c.  Postpetition Interest on Consensual Lien Claims.*

Fischer acknowledges that, even where a contract sets the terms of a lending relationship, bankruptcy courts may impose "reasonableness" limits on "fees, costs or charges" under § 506(b)'s express terms.[9] But, relying on *In re Skyler Ridge,* 80 B.R. 500 (Bankr.C.D.Cal.1987), it asserts that contractual interest terms dictate the postpetition rate. In effect, Fischer maintains that any term labeled as an interest term may not be modified by the bankruptcy court principally because the adjective "reasonable" does not modify the term "interest" in § 506(b).

Section 506(b)'s language, however, does not compel the conclusion that the contract rate or rates bind the court. The statute provides only that the holder of an oversecured claim be allowed "interest on such claim." Section 506(b) does not specify the rate.

■ Generally speaking, when it comes to determining the appropriate postpetition in-

---

9. In recognition that imposition of "late charges" together with a default interest rate would be duplicative, Fischer has waived its claim to the late charges set in its agreement with the debtor. *See Matter of Terry Ltd. Partnership,* 27 F.3d 241, 243–44 (7th Cir.), *cert. denied sub nom. Invext Holdings, N.V. v. Equitable Life Ins. Co.,* — U.S. —, 115 S.Ct. 360, 130 L.Ed.2d 313 (1994) (disapproving of award of both late fees and default interest where it provides double recovery for the same loss); *In re Tastyeast, Inc.,* 126 F.2d 879, 882 (3d Cir.), *cert. denied sub nom. Modern Factors Co. v. Tasty-Yeast,* 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766

(1942); *In re Consolidated Properties Ltd. Partnership,* 152 B.R. 452, 458 (Bankr.D.Md.1993) (explaining that oversecured creditor may seek late charge or default interest, but not both). *See also Matter of Timberline Property Development, Inc.,* 136 B.R. 382, 385–86 (Bankr.D.N.J.1992) (default rate is an unenforceable penalty where it is unrelated to actual costs); *In re Hollstrom,* 133 B.R. 535, 539–40 (Bankr.D.Colo.1991) (rejection of default rate where it has no relationship to actual or projected loss); *In re DWS Investments, Inc.,* 121 B.R. 845, 849 (Bankr.C.D.Cal.1990) (same). *Cf.* discussion *infra,* at 315–17 (addressing justifications for imposing default interest).

terest rate applied to consensual, oversecured claims, including those arising from agreements with *default interest* provisions, bankruptcy courts give deference to the parties' agreed interest term, but may modify the rate in appropriate circumstances. *Vanston,* 329 U.S. at 159, 163–65, 67 S.Ct. at 238, 240–41 (denying payment of interest on interest based on a balance of the equities); *Matter of Terry,* 27 F.3d at 243–44 (presumption in favor of contract rate); *Bradford v. Crozier (Matter of Laymon),* 958 F.2d 72, 75 (5th Cir.), *reh'g denied,* 964 F.2d 1145, *cert. denied,* — U.S. —, 113 S.Ct. 328, 121 L.Ed.2d 247 (1992) (remand to decide whether default or base rate should apply); *Foss v. Boardwalk Partners (In re Boardwalk Partners),* 171 B.R. 87, 92–93 (Bankr.D.Ariz. 1994); *In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 454–56; *In re Courtland Estates Corp.,* 144 B.R. 5, 9 (Bankr.D.Mass.1992) (equities did not compel deviation from contract default rate); *In re Hollstrom,* 133 B.R. 535, 539 (Bankr.D.Colo. 1991) (approving 12% non-default rate in lieu of 36% default rate); *In re DWS Investments, Inc.,* 121 B.R. 845, 849 (Bankr. C.D.Cal.1990) (approving 14% and 15% non-default rates in lieu of 25% default rate); *In*

*re Consolidated Operating Partners L.P.,* 91 B.R. 113, 117 (Bankr.D.Colo.1988); *In re White,* 88 B.R. 498, 511 (Bankr.D.Mass.1988); *In re W.S. Sheppley & Co.,* 62 B.R. 271, 278 (Bankr.N.D.Iowa 1986) (court "not *required* in all cases to apply a contractual default rate of interest") (emphasis in original). Under this approach, although the court's role in setting a postpetition interest rate is more deferential to the parties' prebankruptcy bargain than a thoroughgoing "reasonableness" assessment, the contract does not *determine* the postpetition rate. *Compare United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242–43, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989) *and Rake v. Wade,* — U.S. —, — and —, 113 S.Ct. 2187, 2191 and 2193, 124 L.Ed.2d 424 (1993).[10]

Among other things, the bankruptcy court may determine the true nature of an assessment and consider the extent to which it is enforceable under state, as well as federal, law. The reason why this is so is obvious. Labeling a contract term an interest provision does not make it so.[11] If, though labeled interest, it exacts a penalty or sets liquidated damages in an impermissible manner, it will

---

**10.** *Ron Pair* held that nonconsensual lien claims are entitled to postpetition interest even in the absence of an underlying agreement with interest terms. As to the oversecured creditor:

> The relevant phrase in § 506(b) is: "[T]here shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." "Such Claim" refers to an oversecured claim. The natural reading of the phrase entitles the holder of an oversecured claim to post-petition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement. Recovery of postpetition interest is unqualified. Recovery of fees, costs, and charges, however, is allowed only if they are reasonable and provided for in the agreement under which the claim arose. Therefore, in the absence of an agreement, postpetition interest is the only added recovery available.

489 U.S. at 241, 109 S.Ct. at 1030. *See also Rake v. Wade,* — U.S. at —, 113 S.Ct. at 2191 (interest on mortgage arrearages payable to oversecured mortgagee even though underlying agreement does not so provide).

Because *Ron Pair* and *Rake v. Wade* divorce interest *entitlement* from contract rights, one could argue that determination of the appropri-

ate postpetition interest *rates* may proceed independent of the contract rate (or treating the contract rate only as evidence of an appropriate rate). *Cf.* §§ 1123(d), 1322(e) (1994 enactment overruling *Rake v. Wade*). Such an argument undercuts the generally accepted premise that, absent special circumstances, courts will defer to the contract rate of interest in setting the postpetition rate for an oversecured, consensual claim. *See Matter of Terry,* 27 F.3d at 243 (Regarding default interest, there is a "presumption in favor of the contract rate subject to rebuttal based upon equitable considerations."); *Matter of Laymon,* 958 F.2d at 74; *In re Boardwalk Partners,* 171 B.R. at 89–90; *In re Courtland Estates Corp.,* 144 B.R. at 9; *In re Hollstrom,* 133 B.R. at 539; *In re DWS Investments, Inc.,* 121 B.R. at 849; *Sheppley,* 62 B.R. at 278 and n. 4. Today's result does not depend on such a reading of the recent Supreme Court cases, so we pass the point for now.

**11.** "If you call a tail a leg," went the riddle attributed to Abraham Lincoln, "how many legs has a dog?" The answer: "four, because calling a tail a leg doesn't make it a leg." William Safire, *Still A Tax Increase If It's Not Called That,* The Houston Chronicle, Feb. 23, 1993, at A16.

not be enforced.[12] Moreover, if the term is really a "charge," § 506(b) requires that it be reasonable. The parties may not insulate it from scrutiny by affixing the "interest" label. *Skyler Ridge* acknowledges the appropriateness of such inquiries.[13]

But determining whether a term labeled "interest" is really something else and therefore subject to state or federal law limitation does not end the inquiry. Federal bankruptcy law itself may dictate that a different rate than that set by a prepetition agreement be applied. Default interest rate demands are evaluated "on the facts and equities specific to each case." *Matter of Terry*, 27 F.3d at 243 (citing *In re Consolidated Properties Ltd. Partnership*, 152 B.R. at 457; *In re DWS Investments, Inc.*, 121 B.R. at 849). *Accord Matter of Laymon*, 958 F.2d at 75; *In re Boardwalk Partners*, 171 B.R. at 92–93; *In re Boulders On The River, Inc.*, 169 B.R. 969, 975 (Bankr.D.Or.1994); *In re Courtland Estates Corp.*, 144 B.R. at 9; *Matter of Timberline Property Development, Inc.*, 136 B.R. at 386; *In re Hollstrom*, 133 B.R. at 539; *In re Consolidated Operating Partners L.P.*, 91 B.R. at 117; *In re White*, 88 B.R. at 511; *Sheppley*, 62 B.R. at 278. *See Vanston*, 329 U.S. at 165, 67 S.Ct. at 241.[14] Although "[c]reditors have a right to bargained-for post-petition interest," post-*Ron Pair* decisions generally recognize "a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations." *Matter of Terry*, 27 F.3d at 243 (citing *In re Courtland Estates Corp.*, 144 B.R. at 9; *In re Hollstrom*, 133 B.R. at 539; *In re DWS Investments, Inc.*, 121 B.R. at 849).

There are good reasons why a bankruptcy court should take a hard look at postpetition, preconfirmation interest entitlements, particularly where, as here, they depart from the contract's base rate and particularly when the estate is insolvent.[15] To begin, relative

**12.** State law limitations on loan charges limit the extent of secured claims. *See e.g., In re Tastyeast, Inc.*, 126 F.2d at 881–82 (liquidated damage provision unenforceable penalty); *In re Boardwalk Partners*, 171 B.R. at 92 (noting that if a default rate interest provision were too high, the court could strike it down as a liquidated damages provision); *Matter of Timberline Property Development, Inc.*, 136 B.R. at 385–86 (enforceability of default interest provision requires *both* state law and federal bankruptcy law analysis); *In re Consolidated Operating Partners L.P.*, 91 B.R. at 116 (looking to state usury statute to determine validity of default interest term); *In re White*, 88 B.R. at 510 (holding default interest rate unenforceable as a penalty, and recognizing that "a bankruptcy court is not empowered to give a creditor rights that state law withholds.") (citing *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)); *In re Rolfe*, 25 B.R. 89 (Bankr.D.Mass.1982), *aff'd*, 710 F.2d 1 (1st Cir.1983) (unenforceable penalty). *Cf., e.g., Ferrari v. Barclays American/Business Credit, Inc. (In re Morse Tool, Inc.)*, 87 B.R. 745, 749 (Bankr.D.Mass.1988) (prepayment charge unenforceable); *LHD Realty Corp. v. National Life Insurance Co. (In re LHD Realty Corp.)*, 20 B.R. 722, 725 (Bankr.S.D.Ind.1982) (whether late charges are allowable is a matter of state law).

**13.** Although *Skyler Ridge* declined to balance competing bankruptcy interests to determine whether a contractual default interest rate should apply to an oversecured creditor's claim against an insolvent debtor, 80 B.R. at 510, the court acknowledged that if the default rate were "outside the range" of interest rates commonly set for similar transactions, it would consider it a liquidated damages provision and subject it to appropriate state law scrutiny. *Id.* at 511.

Thus, the *Skyler Ridge* court did scrutinize the default interest rate's appropriateness in the circumstances before it. The contractual "base rate" was 10.75% and the default rate was 14.75%. Concluding that the default rate was reasonable, it went no further. The court did decline to invoke federal law to alter the rate, but the case before it was less than compelling. As a consequence, *Skyler Ridge*'s emphatic dictum to the effect that § 506(b) provides "no authorization" to examine the "reasonableness of the interest rate charged by the secured creditor" and that it provides "no federal law authority to modify the contract rate of interest whether the estate is solvent or insolvent" is somewhat surprising. 80 B.R. at 511. *See In re Boardwalk Partners*, 171 B.R. at 92 (*Skyler Ridge* "implicitly examined the reasonableness of the [default] interest rate"); 2 Queenan, Hendel & Hillinger, *Chapter 11 Theory and Practice* § 15.04, at n. 43 (1994) [hereinafter "Queenan"].

**14.** The postpetition interest rate cases treating oversecured, nonconsensual lien claims provide insight in this regard. Those cases set case-by-case interest rates in the face of controlling state statute. *See, e.g., Wasserman*, 151 B.R. at 5. What could be a more facially valid-under-state-law interest rate than one established by state statute?

**15.** There is no issue of the estate's potential solvency here. Although Fischer's memorandum decries the possibility that the "debtor" would

distribution rights of creditors in bankruptcy are federal law concerns. They are affected, sometimes determined, by the amount of postpetition interest allowed to oversecured creditors. *See Sheppley*, 62 B.R. at 278 (citing *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946) and *American Surety Co. v. Sampsell*, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663 (1946)). When the estate is insolvent, the debtor's prebankruptcy bargain for escalated default interest can be enforced only at the expense of junior, usually unsecured, creditors.[16]

Moreover, parties demanding default interest usually justify their claim by urging that it is necessary to compensate the lender for the increased costs and risks attendant defaulted loans. *Matter of Terry*, 27 F.3d at 244; *In re Tastyeast, Inc.*, 126 F.2d at 882; *In re Boardwalk Partners*, 171 B.R. at 92; *In re Boulders On The River, Inc.*, 169 B.R. at 974–75; *In re Consolidated Properties Ltd. Partnership*, 152 B.R. at 457; *Matter of Timberline Property Development, Inc.*, 136 B.R. at 385–86; *In re Hollstrom*, 133 B.R. at 539–40; *In re DWS Investments, Inc.*, 121 B.R. at 849; *In re Schaumberg Hotel Owner Ltd. Partnership*, 97 B.R. at 952. But each

of those concerns is addressed separately, and specifically, by the Bankruptcy Code. *See* § 362(c) (relief from stay available for cause, including lack of adequate protection); § 506(b) (costs and fees available to oversecured creditor, subject to reasonableness requirement). And there will be instances where the default rate trigger is a missed postpetition payment, under circumstances in which the creditor could not compel adequate protection payments, let alone contract payments, because its claim is fully protected by the value of its collateral. *Westchase I Associates, L.P. v. Lincoln National Life Insurance Co. (In re Westchase I Associates, L.P.)*, 126 B.R. 692, 694–95 (W.D.N.C.1991); *In re Senior Care Properties, Inc.*, 137 B.R. 527, 528–29 (Bankr.N.D.Fla.1992); *In re Lane*, 108 B.R. 6, 8 (Bankr.D.Mass.1989); *In re Heath*, 79 B.R. 616, 619 (Bankr.E.D.Pa. 1987). *Cf. United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370–71, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) (addressing adequate protection and undersecured claims).

This court has discretion to consider whether Fischer should be paid the default

---

gain a windfall if default interest is not paid, that passing remark typifies Fischer's approach to the case, which fails to appreciate that this dispute is no longer a bilateral one and that legal principles other than sanctity of contract bear on its resolution.

At oral argument the trustee represented that, although the estate holds substantial assets in addition to the Seekonk property's proceeds, there is no chance that unsecured creditors will receive more than a "healthy dividend." The representation went unchallenged. The record is devoid of any evidence that the estate holds sufficient funds to result in a surplus distributable to the debtor, whether or not Fischer prevails on any or all of its pending claims. *Compare Ruskin v. Griffiths*, 269 F.2d 827, 831 (2d Cir.1959), *cert. denied*, 361 U.S. 947, 80 S.Ct. 402, 403, 4 L.Ed.2d 381 (1960) (reversing lower court's disallowance of default interest rate where debtor was solvent and benefit of lower interest rate would flow to shareholders rather than creditors) *with Sheppley*, 62 B.R. at 277, 278–79 (creditor relegated to base rate where no distribution would reach shareholder interests). Under these circumstances, the issue as to which party bears the burden of proof on solvency/insolvency does not arise. *Cf. Connecticut General Life Insurance Co. v. Schaumburg Hotel Owner Ltd. Partnership*

*(In re Schaumberg Hotel Owner Ltd. Partnership)*, 97 B.R. 943, 950–52 (Bankr.N.D.Ill.1989) (applying *Sheppley* factors; placing burden of proving insolvency on debtor).

**16.** To the extent that an estate is solvent, leading to a surplus distribution to the debtor, such concerns are abated. *In re Courtland Estates Corp.*, 144 B.R. at 9 (where no other creditors will be affected by the allowance of a default interest rate, the debtor cannot nullify what it otherwise contracted for, *i.e.*, to deny the default rate "would merely provide an undeserved windfall to the debtor."). *See In re Consolidated Operating Partners L.P.*, 91 B.R. at 116 ("When the debtor is solvent, the equities dictate that additional interest be paid to the secured creditor rather than to the debtor.") (citing *Vanston*, 329 U.S. at 164, 67 S.Ct. at 241; *Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Co.*, 791 F.2d 524 [529] (7th Cir.1986); *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir.1959)). *See also Debentureholders Protective Committee*, 679 F.2d at 268–69. *Cf. In re The Boardwalk Partners*, 171 B.R. at 92 (where debtor is insolvent, additional 8% interest rate would come "directly out of the hide of junior creditors [so that] allowing it to be paid would be contrary to the policy of ratable distribution."); *In re Hollstrom*, 133 B.R. at 538–39 and n. 7; *Sheppley*, 62 B.R. at 278–79.

rate interest it seeks on at least two grounds. First, I may consider whether, under these circumstances, enforcing the default interest provision comports with the Code's objective of achieving an equitable distribution of assets among all the estate's creditors. *See, e.g., Matter of Laymon,* 958 F.2d at 74–75; *Ruskin v. Griffiths,* 269 F.2d at 830–31 (noting equities differ if debtor is solvent); *Wasserman,* 151 B.R. at 5; *In re Boardwalk Partners,* 171 B.R. at 91–92; *In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 455–57 (concern over depriving other creditors' recovery if default rate allowed); *In re Courtland Estates Corp.,* 144 B.R. at 9; *Matter of Timberline Property Development, Inc.,* 136 B.R. at 386; *In re Hollstrom,* 133 B.R. at 537; *In re DWS Investments, Inc.,* 121 B.R. at 847 (whether to allow interest in bankruptcy depends on the "balance of equities between creditor and creditor or between creditor and the debtor") (quoting *Vanston,* 329 U.S. at 165, 67 S.Ct. at 241); *In re White,* 88 B.R. at 506–07; *Sheppley,* 62 B.R. at 278. Second, I may consider whether the default interest covenant is, rather than a true interest term, a "charge" subject to § 506(b)'s reasonableness requirement.

### d. Fischer's Default Rate Claim.

■ Fischer's claim to default interest fails because to honor it would be inimical to federal bankruptcy law's concern for the fair and equitable distribution of the debtor's assets.

The time value of money lent has been paid to Fischer through the (generous) 18% base interest rate. Fischer has not argued that the base rate has not been (at least) comparable to prevailing market rates at and following default. Although Fischer asserts that "a less creditworthy borrower must pay a premium to obtain the continued use of money," it must be remembered that the default here was a payment default triggered by bankruptcy. Throughout the course of Kalian's bankruptcy Fischer's collateral's value was protected and its claim was adequately protected by an equity cushion. Had the collateral been threatened, Fischer could have sought adequate protection or moved for relief from stay for cause. § 362(d)(1). There was never any cognizable risk that Fischer would go unpaid, or even underpaid.

To the extent that default interest might be justified by the increased cost of administering and collecting a defaulted loan, *see Matter of Terry,* 27 F.3d at 244; *In re Tastyeast, Inc.,* 126 F.2d at 882; *In re Boulders On The River, Inc.,* 169 B.R. at 974–75; *In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 457, it cannot be so justified here. In as much as it has requested them, and its agreement provides for them, Fischer will recover its *reasonable* "fees, costs and charges." § 506(b).[17] To award it default rate interest on account of such expenses would compensate it twice.[18]

The bankruptcy process provided Fischer protection against all the risks and costs that might support enforcement of a default interest term. To allow double interest for payment defaults would plainly be wrong. *Cf. Sheppley,* 62 B.R. at 278 (considering five factors militating against payment of default interest).[19] In the alternative, and for the

---

17. Fischer has offered no evidence of increased costs of administering the Kalian loan beyond those that it seeks specifically to recoup by way of its attorneys' fees request. That request is discussed in detail *infra.*

18. Fischer has waived its late charge claim, thus eliminating the patent double recovery that enforcing a default interest provision and late charge would entail. *See Matter of Terry,* 27 F.3d at 243–44; *In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 458; *Supra,* at n. 9.

19. *Sheppley* based its conclusion that payment of interest at the contractual default rate was inappropriate on five factors: (1) no "realistic risk of nonpayment" before or during bankruptcy; (2) no evidence that the base rate was not compara-

ble to the market rate before and after default; (3) justifications proffered for an increased post-default rate were not borne out by the facts of the case; (4) the record did not indicate a likelihood that the estate would have sufficient assets to make a distribution to equity holders and (5) the creditor has caused delay by engaging in "unnecessarily obstructive tactics." 62 B.R. at 278–79. *See also In re DWS Investments, Inc.,* 121 B.R. at 847 n. 4 and 849; *In re Schaumberg Hotel Owner Ltd. Partnership,* 97 B.R. at 950–52; *In re White,* 88 B.R. at 511. *Cf. Matter of Terry Ltd. Partnership,* 169 B.R. 182, 184–85 (Bankr.N.D.Ind. 1993), *aff'd,* 27 F.3d 241 (7th Cir.1994) (*Sheppley* factors neither exclusive nor exhaustive). Four of the five *Sheppley* factors are satisfied here. But my holding in this regard is not based exclusively on the *Sheppley* analysis. In this case the

same reasons, I conclude that, under the circumstances, the default interest term operates as an unreasonable "charge" and must be disallowed under § 506(b). *See, e.g., In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 455–56 (default rates are akin to late charges and should be examined for § 506(b) reasonableness). *Cf. In re Kroh Bros. Development Co.,* 88 B.R. 997, 1001 (Bankr.W.D.Mo.1988) (prepayment penalty unenforceable as an unreasonable charge pursuant to § 506(b)).

### 2. Attorneys' Fees.

Fischer also asserts that, pursuant to § 506(b) and its agreement with Kalian, it is entitled to $16,019.00 in attorneys' fees and $455.10 in disbursements. Fischer's counsel, Shafner & Gilleran, has submitted its fee application to substantiate the award Fischer seeks.

Although I agree that Fischer is entitled to reasonable fees and expenses under its loan agreement and § 506(b), I do not agree that the amount it demands even approaches reasonableness.

### a. Guiding Principles.

Fischer's fee entitlement is, in the first instance, established by the terms of its note and mortgage. *See Ron Pair,* 489 U.S. at 241, 109 S.Ct. at 1030; *Manufacturers National Bank v. Auto Specialties Mfg. Co. (In re Auto Specialties Mfg. Co.),* 18 F.3d 358, 360–61 (6th Cir.1994); *In re Schwartz,* 87 B.R. 41, 42–43 (S.D.Ohio 1988); *In re Reposa,* 94 B.R. 257, 259 (Bankr.D.R.I.1988). Assuming that the agreement provides for fees, the creditor is oversecured, and procedural requisites are met, the creditor is entitled to a fee award. *Auto Specialties,* 18 F.3d at 362 (citing *In re Dalessio,* 74 B.R. 721, 723 (9th Cir. BAP 1987)).

The *extent* of fees awardable to the oversecured creditor, however, is subject to § 506(b)'s reasonableness limitation. *Ron Pair,* 489 U.S. at 241, 109 S.Ct. at 1030. And determining the reasonable fee is a matter of federal law, *In re Hudson Shipbuilders, Inc.,* 794 F.2d 1051, 1056 (5th Cir.1986); *In re 268,*

Ltd., 789 F.2d 674 (9th Cir.1986); *Unsecured Creditors' Committee v. Walter E. Heller & Co. Southeast, Inc. (In re K.H. Stephenson Supply Co.),* 768 F.2d 580 (4th Cir.1985), calling for the bankruptcy court's exercise of independent judgment "to avoid waste of estate assets and overreaching...." *Solomon v. Wein (In re Huhn),* 145 B.R. 872, 875 (W.D.Mich.1992). *See In re Reposa,* 94 B.R. at 261–62.

Determining the § 506(b) reasonable fee requires consideration of "not only the fee agreement, but the overall fairness and reasonableness of the fee under all of the circumstances." *In re Huhn,* 145 B.R. at 876 (citing *In re K–Fab, Inc.,* 118 B.R. 240, 242 (Bankr.M.D.Pa.1990) and *Lund v. Affleck,* 587 F.2d 75 (1st Cir.1978)). "[F]utile efforts aimed at achieving unattainable objectives are unreasonable." *In re Saturley,* 131 B.R. 509, 521 (Bankr.D.Me.1991). Moreover, it is " 'inherently unreasonable to ask a debtor to reimburse attorneys' fees incurred by a creditor that are not cost justified ... or necessary to preservation of the creditor's interest.' " *In re Reposa,* 94 B.R. at 262 (quoting *In re Miracle Enterprises, Inc.,* 57 B.R. 133, 136 (Bankr.D.R.I.1986)).

A creditor's counsel's fee application should be unambiguous and virtually self-contained so that by reviewing it and the underlying itemized billing information, the court can reach an informed determination of the reasonable fee. *In re Huhn,* 145 B.R. at 875. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984); *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *In re New England Metal Co., Inc.,* 155 B.R. 38, 41 (Bankr.D.R.I. 1993). *See also* R.I. Local Bankr. Rule 25 (requiring detailed itemization in fee applications). Fee requests will be reduced: "(1) whenever we are unable to ascertain the nature of the service provided; (2) wherever it is unclear whether the activity involved collection of the obligation in question; or (3) wherever the hours expended are not stated." *In re Reposa,* 94 B.R. at 259. *See also In re Huhn,* 145 B.R. at 875.

pertinent facts, combined with operation of applicable Code provisions, discredit all the justifi-

cations Fischer has advanced in support of its default interest claim.

After reviewing the fee application independently, my job is to determine a reasonable hourly rate and the number of hours counsel reasonably expended within the scope of the creditor's contractual fee entitlement, employing the lodestar model to determine a reasonable fee. *See Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A. (In re Boston & Maine Corp.),* 778 F.2d 890, 895–96 (1st Cir.1985); *In re Casco Bay Lines,* 25 B.R. 747 (Bankr. 1st Cir.1982); *In re Saturley,* 131 B.R. at 521. I commence consideration of the fee request by evaluating Shafner & Gillerman's fee application in the context of Fischer's contractual entitlements, noting the problems that it presents.

#### b. Lumping.

■ It is difficult to comb Shafner & Gilleran's fee application too finely. As the trustee points out, there is a fair amount of "lumping" within the application, making it difficult to identify the time devoted to individual tasks. Time and again in this jurisdiction, counsel have been warned against lumping and have taken their lumps in consequence of the practice. R.I. Local Bankr. Rule 25. *See, e.g., In re New England Metal Co., Inc.,* 155 B.R. at 41. Lumping renders it "impossible to review the reasonableness of time devoted to a particular task." *In re Swansea Consolidated Resources, Inc.,* 155 B.R. 28, 32–33 (Bankr.D.R.I.1993).

#### c. Vague Task Descriptions.

The task descriptions set out in the application are less than clear. Indeed, the descriptions are so vague that in many instances it is impossible to tell whether the tasks related meaningfully to Kalian's obligation. Typical is the time entry for April 23, 1993, which indicates that Attorney Greenman spent 1.3 hours (at an hourly rate of $160.00) on the following: "Send out package to Ken Fischer; negotiate letter with Rhodes; meet with Randy White and exchange documents; letter to CTI, several calls to CTI; discussion with Fischer." Here's another example: "Conference with Gilleran; review of bankruptcy matters" for which the attorney recorded 1.0 hours of work at $160.00.

As a result of vague task descriptions, whether many of the tasks described in the application relate, in whole or in part, to collection of the Kalian note is anyone's guess. The answer is certainly not apparent from counsel's submissions.[20]

#### d. Time Spent on Non–Collection Issues.

Insofar as relevant here, Fischer's note entitles it to recover "all costs and expenses, including all attorneys' fees, incurred in connection with the collection" of the note after default, and arising "in connection with any and all litigation involving the legality and/or enforceability" of the note. The mortgage also provides that Fischer may collect attorneys' fees incurred "by reason of any default in the performance or observance of any condition" of the mortgage.[21]

Parsing the application (as best I can) discloses that Fischer seeks to recover fees generated in counsel's efforts to straighten out the relations between Fischer and Rhodes and to obtain an assignment of the note and mortgage.[22] This was not debt collection work, and is not recoverable under the note and mortgage. It cannot be recovered under § 506(b). *See Ron Pair,* 489 U.S. at 241, 109 S.Ct. at 1030; *In re Brentwood Outpatient, Ltd.,* 43 F.3d 256, at 262 (6th

---

**20.** The question is particularly problematic because Fischer's counsel has acknowledged performing work for Fischer regarding other loans serviced by Rhodes during the same time frame. Thus, references to work performed for Fischer or to work relating to Rhodes do not necessarily denote work associated with the Kalian bankruptcy. Affidavit of Michael C. Gilleran, Esq. Although counsel asserts that time entries have been divided among those matters and, when necessary, prorated among them, the basis on which the allocations were made is not apparent from the time entries themselves. In any event, this problem is cumulative to the others presented by the fee application.

**21.** Fischer is also entitled to recover fees incurred "in connection with any and all litigation involving the legality and/or enforceability" of its note. But at no point has the "legality or enforceability" of the note or the mortgage been at issue. Throughout this case, Fischer has received payments in respect of its secured claim. The only disputes have addressed the *extent* of Fischer's secured claim (*i.e.,* interest, fees and late charges).

**22.** *See supra,* at n. 2.

Cir.1994); *In re Auto Specialties Mfg. Co.,* 18 F.3d at 360; *Pasatiempo Properties v. Le Marquis Associates (In re Le Marquis Associates),* 81 B.R. 576, 578–79 (9th Cir. BAP 1987); *In re Boulders on The River, Inc.,* 169 B.R. at 980–81 (attorneys' fees related to assignment of claim from predecessor-in-interest disallowed as outside scope of fee provision); 2 *Norton Bankruptcy Law and Practice 2d* § 43:3 at 43–14 (1994); 2 *Queenan* § 15.05 at 15:18–19.[23]

*e. Nonroutine Charges—Billing Judgment.*

The application also discloses that an inordinate amount of time was devoted to routine tasks. The summary of work by categories provided by counsel discloses as much on its face. Notwithstanding the fact that counsel was not retained until after Kalian filed bankruptcy and after her postpetition default, Fischer's counsel spent 55.3 hours on "post-petition collection efforts;" 21.9 hours in connection with the trustee's sale of the Seekonk property; and 47.1 hours (before hearings and post-hearing briefing) on ."recovery of fees, costs and interest." Exhibit B to Shafner & Gilleran Fee Application.

Although lumping and vagueness complicate the effort, I can readily discern that counsel's charges for specific tasks are often unreasonably high. Dispatching an attorney (even a junior associate) from Boston to Providence to obtain copies of the debtor's schedules and charging the attorney's full hourly rate for the travel, is patently unreasonable.[24] The same can be said for billing approximately 5 hours of *senior attorney* time (generating fees of $870.00) for calculating a loan payoff figure at the time of the trustee's sale.[25] There are yet other instances, each of which is relatively minor, in which task descriptions and time entries reveal heavy-handed billing.[26] I can only conclude

that such heavy-handedness pervades the entire bill.

*f. Evaluating the Fee Entitlement.*

In light of the fee application's deficiencies, the task of evaluating Fischer's fee demand is daunting. But it is Fischer's burden to establish its entitlement to fees that are reasonable under § 506(b). *See, e.g., Reposa,* 94 B.R. at 260; 3 Lawrence King, *Collier on Bankruptcy* ¶ 506.05 at 51–52 (15th ed. 1993). Lumping, opaque descriptions and a readily discernible absence of billing judgment disable its efforts to carry that burden.

Recalling that Fischer was oversecured and unthreatened and that repayment of its loan was never in serious doubt, I am left to ponder how Fischer's counsel could have run up nearly $16,019.00 in fees attempting to collect a $40,000.00 claim. Fischer's fee demand must be substantially reduced. *See Reposa,* 94 B.R. at 262 (reducing § 506(b) fees in light of, *inter alia,* application's informational deficiencies, unwarranted "hyperactive" efforts in light of equity cushion, and fee request that represented 25% of claim in dispute) (citing *King v. Greenblatt,* 560 F.2d at 1027). In fact, the fee demand is so patently overblown that applying a percentage discount, as is often done, is an unsatisfactory alternative. *Compare In re Swansea Consolidated Resources, Inc.,* 155 B.R. at 33 (applying across-the-board percentage reduction) *and In re Smuggler's Beach Properties, Inc.,* 149 B.R. 740, 745 (Bankr.D.Mass.1993) *with In re New England Metal Co., Inc.,* 155 B.R. at 40–41 (setting fees at appropriate amounts under circumstances).

For these reasons I will fix Fischer's total § 506(b) fee award at $5,250.00. That sum represents a *reasonable* number of hours (35) of attorney time at a *reasonable* hourly rate ($150.00/hour) devoted to ascertaining, monitoring, protecting and litigating Fischer's po-

---

**23.** As near as I am able to tell, from February 1, 1993, until May of that year, the bulk of attorney time itemized in the application (approaching 30 hours at rates ranging from $100.00 to $180.00 per hour) is devoted to those issues, rather than to collection of this debtor's obligation.

**24.** Paul M. Tyrell, Esq., time entry for February 18, 1993. Exhibit C to Shafner & Gilleran Fee Application. I note, too, that this time entry shows 3.5 hours expended, but records a $650.00

charge notwithstanding Mr. Tyrell's $100.00 hourly rate.

**25.** Time entries of Michael C. Gilleran, Esq., for the Month of June 1993. Exhibit C to Shafner & Gilleran Fee Application.

**26.** *See* time entries for September 29 and October 5, 1994. Exhibit C to Shafner & Gilleran fee application.

sition from the date of filing to the Seekonk property's sale and beyond.[27] Putting aside the grasping and thrashing, this case required no more.[28]

### g. Disbursements.

■ Fischer's counsel's submissions in support of the fee application's expense reimbursement component is woefully deficient under the law of this jurisdiction.[29]

Counsel's claimed expenses include unitemized facsimile transmission charges for which no per page charge information appears (but which most assuredly exceed the generally allowed $.15 per page rate), *see In re 321 South Maine Street, L.P.,* 155 B.R. 41, 43 (Bankr.D.R.I.1993) (explaining presumptively reasonable per page charge), and which are unaccompanied by any explanation regarding their "necessity and/or reasonableness." *In re De Weldon,* 176 B.R. 665, 668–69 (Bankr.D.R.I.1995). Accordingly, expense reimbursement for facsimile transmission charges is denied.

Expenses also include in-house photocopying charges for which no itemization regarding the number of pages copied or the per page charge is provided. Accordingly, reimbursement for in-house photocopying is denied. *See In re 321 South Maine Street, L.P.,* 155 B.R. at 43 (setting presumptive *per page* cost for in-house photocopies).

In the absence of explanations of need or purpose, secretarial overtime ($1.72), generic "miscellaneous" expenses ($50.00), a generic telephone "expense" ($4.00), messenger/courier/express mail charges ($83.50) must be disallowed. *Id.* (addressing messenger/express mail charges and staff overtime).

Notwithstanding the fact that itemizations and, in some cases explanations, are less than perfect, I will allow reimbursement of long distance charges ($73.46), commercial photocopy services ($307.63), real property appraiser's charges ($150.00), and postage (excluding express mail) ($13.90). These items, totalling $544.99, are generally reasonable in amount and within the range of generally expected, ordinary expenses in a case such as this one.

### CONCLUSION

For the reasons set forth above, Fischer's claim for an interest at the default rate is denied. Fischer's demand for attorneys' fees and costs is allowed in the amount of $5,794.99.

---

**27.** Given the range of rates charged by Fischer's counsel's firm, the $150.00 hourly rate represents what would be charged by an experienced associate or junior partner or an average of charges to be expected if a junior associate handled the matter with occasional guidance from a senior attorney. That's all this case should have required.

**28.** In post-hearing submissions Shafner & Gilleran supplemented its fee application, seeking an additional $4,164.00 in fees and $437.93 in expense reimbursements, bringing the total fees and expenses sought to $21,076.03.

The supplemental application is riddled with the same problems as the original: excessive charges for routine work (*e.g.,* 2.1 hours of attorney time at $100.00/hr. for "telephone call with Legal Copy Specialists; copy fee application/memo to compel; copy service list (60 parties); draft letter to clerk"); lumping (*e.g.,* 3.6 hour entry on October 25, 1994); work outside the scope of contractual entitlement (*e.g.,* .3 hours attorney time at $100.00/hr. for "telephone call with Philomena at AMICA Insurance re: our fee application"); heavy-handed billing (*e.g.,* .3 hours attorney time at $100.00/hr. to "review notice for hearing on P. [sic] Kalian matter").

*Reasonable* fees for the activities covered by the supplemental application have been factored in to the amount allowed above.

**29.** The following analysis addresses both the initial application and the supplemental application. *See supra,* at n. 28.